**UNITED STATES v. UNITED STEEL-WORKERS OF AMERICA, CIO et al.**

No. 185, Docket 22577.

United States Court of Appeals Second Circuit.

Argued Feb. 2, 1953.

Decided March 2, 1953.

Warren E. Burger, Asst. Atty. Gen.,
Holmes Baldridge, Asst. Atty. Gen., George
L. Grobe, U. S. Atty., Buffalo, N. Y., Edward H. Hickey, Sp. Asst. to Atty. Gen.,
Samuel D. Slade, Herman Marcuse, T. S. L.

**134**

Perlman, John G. Roberts, Cornelius J. Peck, Attys., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Arthur J. Goldberg, Gen. Counsel, David E. Feller, Asst. Gen. Counsel, Washington, D. C., for United Steelworkers of America, CIO, defendants-appellants, Peter J. Crotty, Buffalo, N. Y., and Herman E. Cooper, New York City, of counsel.

Before SWAN, Chief Judge, and CHASE and CLARK, Circuit Judges.

CHASE, Circuit Judge.

The United States brought this suit, at the direction of the President, pursuant to § 208 of the Labor-Management Relations Act of 1947, 29 U.S.C.A. § 178, 61 Stat. 155, against United Steel Workers of America, CIO Local 2286, United Steelworkers of America, CIO and Local 4498, United Steelworkers of America, CIO, who are the appellants hereinafter called the union, and against the Locomotive Company, Inc., hereafter called the company, to obtain an injunction in a labor dispute. An injunction was granted against all of the defendants but the union alone has appealed and has presented three issues: (1) whether on the facts which are undisputed the appellee has made out a cause of action within the coverage of the statute properly construed; (2) if so, whether the statute, so construed, is constitutional; and (3) whether the injunction is too broad in respect to restraint upon the conduct of individual members of the union.

The record shows that the union at all pertinent times was the exclusive bargaining representative of the company's employees at its plant at Dunkirk, N. Y. The collective bargaining agreement in effect in 1951 was to expire on January 31, 1952 and the parties attempted to agree upon the terms of a new one, but in December 1951 their efforts broke down and the union threatened to cause the employees to strike beginning on January 31, 1952.

At its Dunkirk plant the company was then engaged in commerce and in the production of goods for commerce, primarily in the "heat exchanger, pressure vessel and prefabricated pipe industry"; the threatened strike would not have affected all, or a substantial part, of that industry. A major part of the Dunkirk plant's production was to carry out contracts the company had with the Atomic Energy Commission and certain of its prime contractors to furnish specialized articles which were essential to the completion of the Commission's program for construction of facilities needed to produce atomic bombs for the national defense. These essential articles were heat exchanger shells used in the production of heavy water needed to operate nuclear reactors capable of producing fissionable materials, gas converter assemblies and other critical items all of which could have been obtained elsewhere only after other potential sources had been equipped to produce them. Resort to other sources would, consequently, have involved months of delay and set back correspondingly the construction program of the Commission and the production of fissionable materials and atomic weapons vital to the national defense. The threatened strike would have affected a substantial part of the atomic weapon industry and would have imperiled the national safety.

The strike was not called as threatened, however, because on December 29, 1951 the President, by Executive Order No. 10233, 16 Fed.Reg. 3503, 50 U.S.C.A.Appendix, § 2071 note, certified the dispute to the Wage Stabilization Board. As that Board had under consideration the labor dispute in the steel industry, the union and the company agreed to defer the presentation of their dispute until the Board had finished with that in the steel industry and, meanwhile, continued their attempts to negotiate a new collective bargaining agreement without stoppage of work at the Dunkirk plant. After the Board had made its recommendations for a settlement of the steel industry dispute, the union and the company, in April 1952, requested it to hear their dispute. A designated panel did so and concluded the hearings on June 27, 1952; but, before the Board had made any recommendations, amendments to the Defense Production Act, 50 U.S.C.A.Appendix, § 2103(b) (6) effective July 29, 1952, did away with its jurisdiction so to do. Efforts to agree upon a new contract were

continued but they were unsuccessful and a strike was called by the union and put into effect on August 29, 1952. It was initiated and conducted without violence but it did, as the one threatened for January 31, 1952 would have done, affect a substantial part of the atomic energy industry and imperil the safety of the nation.

Consequently, on December 3, 1952, the President resorted to the National Emergencies provisions of the Labor-Management Relations Act, 29 U.S.C.A. §§ 176–180, 61 Stat. 155, §§ 206–210, by issuing Executive Order 10417, 17 Fed.Reg. 10981, U.S.Code Congressional and Administrative News 1952, p. 1112, creating a Board of Inquiry to investigate the dispute and report to him pursuant to § 206 of the Act. Thereafter, in strict compliance with the provisions of the Act, there was a report by the Board to the President, who then sent a communication to the Attorney General which in part stated that "[i]n my opinion this unresolved labor dispute has resulted in a strike affecting an entire industry or a substantial part thereof engaged in trade and commerce among the several States and with foreign nations and in the production of goods for commerce, which strike, if permitted to continue, will imperil the national safety" and which directed the Attorney General to bring this suit. He, accordingly, did so by filing a complaint on December 12, 1952 which sought relief as follows:

"1. That this Court enter its order enjoining the defendants, and each of them, and their officers, agents, servants and employees, and all persons in active concert or participation with them, or any of them (a) from in any manner continuing, encouraging, ordering, aiding, engaging or taking any part in a strike or lock-out in the plant of the American Locomotive Company at Dunkirk, New York, and (b) from in any manner interfering with or affecting the orderly continuance of work in the said plant, and from taking any action which would interfere with this Court's jurisdiction in the premises.

"2. That this Court enter its order enjoining the members of the defendant Union, and those of Local 2286 and of Local 4498, acting in concert, from in any manner continuing, encouraging, ordering, aiding, engaging or taking any part in a strike or lock-out in the plant of the American Locomotive Company at Dunkirk, New York, or from in any manner interfering with or affecting the orderly continuance of work in the said plant, and from taking any action which would interfere with this Court's jurisdiction in the premises; Provided, however, that nothing in this paragraph shall be construed to require an individual employee to render labor or service without his consent nor to make the quitting of his labor or service by an individual employee an illegal act.

"3. That this Court enter its order directing the defendant Union and those of Local 2286 and of Local 4498 and its appropriate officers, agents, servants and employees (a) forthwith to instruct all its members in Local 2286 and Local 4498, United Steel Workers of America, CIO, to continue or resume their normal employment, and (b) to take all action which may be necessary to insure that such instructions are carried out.

"4. That this Court order the several defendants to engage in free collective bargaining in good faith for the purpose of resolving their dispute and to make every effort to adjust and settle their differences, as contemplated by the National Emergencies provisions of the Labor Management Relations Act, 1947.

"5. That this Court, pending the final determination of this cause, issue a preliminary injunction restraining and enjoining the defendants, their members, officers, agents, servants and employees, and all persons in active concert or participation with them, in the manner and form aforesaid.

"6. That, pending the issuance of the aforesaid injunction, the Court issue forthwith a temporary restraining order, restraining and enjoining the defendants, their members, officers,

agents, servants and employees, and all persons in active concert or participation with them, in the manner and form aforesaid.

"7. That the Court grant plaintiff such other and further relief as may be just and proper."

On the same day the temporary restraining order was granted *ex parte* as requested and a hearing on the temporary injunction was set for December 18th. At that hearing the company appeared but made no contest. The union appeared and moved to dismiss the complaint and to dissolve the restraining order on the grounds that the complaint failed to state a cause of action, that the court lacked jurisdiction of the subject matter, and that "[t]he statutory provisions upon which the Government predicates its right to injunctive relief (Section 208 of the Labor Management Relations Act of 1947) are unconstitutional in that they vest non-judicial functions in the District Courts of the United States, in violation of Article III of the Constitution of the United States and the doctrine of separation of powers."

At the hearing in the district court, the parties were in substantial agreement as to the facts; and, in addition to those already stated, the following facts were found: After the *ex parte* order was made known to the union, the union promptly took appropriate steps to assure compliance with it, and on December 15, 1952 normal work at the Dunkirk plant was resumed. Such resumption of work would not have occurred but for the order and unless an injunction were issued effective at the expiration of the *ex parte* order, which had been extended upon consent of the defendants while the issues raised at the hearing were *sub judice* but without prejudice to any defense which the defendants might interpose, the strike would be resumed. The strike had caused, and if resumed would continue to cause, a cessation of work, "on the production of certain critical items, *i. e.*, unique internal nickel-plated process piping, heat exchanger shells, and gas converter subassemblies, which the Company is under contract to deliver [to] certain prime contractors of the Atomic Energy Commission,

essential in the contruction of major facilities of the Atomic Energy Commission for the production of such fissionable material." It was also found that the production of such items involved a highly specialized process and that their procurement from other sources was impossible at that time. Eventual procurement from other sources, if made necessary by the resumption of the strike, would cause delays of many months, in addition to the delay already caused by the strike, in the construction of "plants of the Atomic Energy Commission for the production of fissionable materials located at Paducah, Kentucky, Oak Ridge, Tennessee, Portsmouth, Ohio, and the Savannah River Project near Augusta, Georgia." The cost of the construction of the facilities delayed by the strike exceeded the cost of all the "existing facilities under the jurisdiction of the United States presently engaged in the production of fissionable materials. The construction of these new facilities is imperative in order to meet the production schedules for the completion of atomic weapons, which the President, based on recommendations of the Joint Chiefs of Staff and the National Security Council, has determined to be required for national defense. These production schedules cannot be accomplished if this strike continues." It was found also that the amount of fissionable material produced determined how many atomic weapons could be made and that the resumption of the strike would delay the construction of plants which "constitute a substantial part of the atomic energy industry of the United States," which industry was "engaged in trade and commerce among the several States and with foreign nations and is engaged in the production of goods for commerce." Further, the resumption of the strike would "affect a substantial part of the atomic energy industry engaged in the production of goods for commerce," would "imperil the national safety" and would "cause irreparable injury to the United States of America for which there is no adequate remedy at law."

It was held that the injunctive provisions of the statute were valid, that the appellee had proved compliance with all conditions

precedent to the institution of the suit, that the court had jurisdiction, and that the cause of action alleged had been established on the facts shown and found. The motions to dismiss the complaint, to dissolve the restraining order, and to modify its terms were all denied and a preliminary injunction was issued which continued in effect the provisions of the restraining order.

■ Turning now only to the question of statutory coverage, it would seem that the facts found make it abundantly clear that the strike did and, if allowed to continue, would affect a substantial part of an entire industry and imperil the national safety. Such findings bring this situation within the scope of the ordinary meaning of the language used in § 208(a) of the Act. That section provides that, at the direction of the President and after compliance with the statutory conditions precedent, the United States may bring such a suit as this in "any district court of the United States having jurisdiction of the parties to enjoin such strike or lock-out or the continuing thereof, and if the court finds that such threatened or actual strike or lock-out—

"(i) affects an entire industry or a substantial part thereof engaged in trade, commerce, transportation, transmission, or communication among the several States or with foreign nations, or engaged in the production of goods for commerce; and

"(ii) if permitted to occur or to continue, will imperil the national health or safety, it shall have jurisdiction to enjoin any such strike or lock-out, or the continuing thereof, and to make such other orders as may be appropriate."

But it is argued that, although admittedly a substantial part of an entire industry engaged in the production of goods for commerce was affected by the strike and will be affected if its resumption occurs and that the national safety has been, and will be, thereby imperiled, "this kind of emergency is not the kind of emergency the Taft-Hartley Act was intended to cover." Reliance is put upon what is urged to be adequate legislative history to show that Congress intended the injunctive provisions of § 208 to apply only to strikes of a substantially industry-wide scope and not to those of a local character such as this one. Such history does show that the danger to the national health or safety resulting from industry-wide strikes was one of the things which led to the passage of the Act, but it is by no means clear that it was the intention of Congress to limit its scope to such a situation. We find no report of a legislative committee in charge of legislation which finally emerged as the Labor-Management Relations Act of 1947, 29 U.S. C.A. § 141 et seq., which so interpreted it; and, though some members of Congress may have indicated that their primary concern was with the evils flowing from industry-wide strikes, we do not find legislative history which warrants attributing to Congress an intention to make that the sole basis for reviving to some extent the jurisdiction which the district courts had in labor disputes before the effective date of the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101–115. The obvious purpose of the instant statute was to provide some means for protecting the national health and safety when that was imperiled by a strike or a lock-out which burdened or obstructed commerce or the production of goods for commerce in an entire industry or substantial part of an industry. Had Congress meant to confine the application of this statute to situations resulting from industry-wide strikes it is reasonable to suppose that it would have used language better adapted to that end. By using "affects" instead of some more confining word as regards the strike or lock-out which might be enjoined it made, we think, the test of applicability not merely the extent of the strike within an industry but the extent of the effect of a strike upon an industry and the national health or safety. Such a construction is in accord not only with the usual meaning of the words used but also with the purpose and policy of the entire statute as set forth in the second paragraph of § 1(b) as follows:

"It is the purpose and policy of this act, in order to promote the full flow

of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce *and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce.*" (Emphasis supplied.)

█ Moreover, where the language of a statute passed to carry out what Congress has expressed to be its broad purposes and policy may so readily be read to bring within its coverage such a grave peril to the national safety as that disclosed by the facts here found, it would require the clearest kind of legislative history to justify an interpretation which left the nation helpless in the face of it; a danger to which Congress would hardly have been expected to stand indifferent.

█ As we believe the statute does apply, we will now consider its validity. As to that it is argued that the provisions of § 208 transgress the limitations of Article III of the Constitution in that non-judicial functions unrelated to any justiciable case or controversy are conferred upon the district courts; or at least that the rule of separation of powers as regards the three branches of the government is violated.

The argument that Sections 206–210 of the Act are unconstitutional is based on the assertion that they involve no violation of the law, at least until by granting an injunction the court makes unlawful what Congress did not, and that the duties imposed on the court by those sections are, therefore, merely administrative ones in aid of the settlement of a labor dispute involving a strike or a threatened strike. That the duties imposed on the courts are merely administrative is made clear, it is

argued, by the fact that, in partially restoring the jurisdiction to grant injunctions in labor disputes that was taken away by the Norris-LaGuardia Act, the Taft-Hartley Act authorizes an injunction only for a limited period of time, at the end of which the court must dissolve it on motion regardless of whether the labor dispute has been settled or the danger to national health or safety removed. The appellants find further support for their position in the provisions of the Act which establish a non-judicial procedure to be followed in settling the dispute, if necessary, after the injunction has been granted. Section 209 requires the parties to the dispute to continue their efforts at settlement "with the assistance of the Service created by this act", though imposing no obligation on the part of any party to accept all or any part of a settlement proposed by such Service. That section also provides that the President shall make available such Service by reconvening the board of inquiry which had reported before the institution of the suit, that at the end of a sixty-day period the board should report to the President, and that the President should make the report public. It is further provided that within the succeeding fifteen days a secret ballot of the employees is to be taken to determine whether they wish to accept the final offer of settlement made by their employer and that the result is to be certified to the Attorney General within five days thereafter. It is at the end of such eighty days or whenever a settlement has been reached, whichever is sooner, that the injunction must be dissolved on motion in accordance with § 210.

But although the jurisdiction to grant an injunction is thus limited and its issuance is by statute designed to make possible further efforts to settle the dispute without work stoppage, the function of the court is not administrative but judicial, just as is that of an appellate court when it reviews and enforces an order of the National Labor Relations Board. The court then acts in aid of the settlement of a labor dispute and so it does here, but in each instance it performs judicial functions. Cf. Douds v.

Local 1250, Retail Wholesale Department Store Union, 2 Cir., 170 F.2d 695. The instant Act makes an actual, or threatened, strike or lock-out of the kind described in § 208 something which for at least a period may be prohibited. The prohibition of strikes or lock-outs under given circumstances implies that they are, under such circumstances, an invasion of the rights of the public. Whether it is the duty of the court to grant an injunction depends upon the findings of fact to be made by the court as the statute requires. The statute creates the right on the part of the public to be protected from the danger of such a strike or lock-out. Whether there is an existing or threatened strike or lock-out which, under the statute, is an invasion of the rights of the public presents the usual kind of case or controversy which is justiciable by a court. Indeed, it falls neatly within the definition found in Muskrat v. United States, 219 U.S. 346, 357, 31 S.Ct. 250, 254, 55 L.Ed. 246, on which the appellants must rely:

"By cases and controversies are intended the claims of litigants brought before the courts for determination by such regular proceedings as are established by law or custom for the protection or enforcement of rights, or the prevention, redress, or punishment of wrongs."

And that the United States can be a party to a case or controversy of this type is shown by In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092. See also, Sanitary District of Chicago v. United States, 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352; Kern River Co. v. United States, 257 U.S. 147, 42 S.Ct. 60, 66 L.Ed. 175; United States v. California, 332 U.S. 19, 27, 67 S.Ct. 1658, 91 L.Ed. 1889.

Nor was the injunction too broad. No individual employee was required to do or refrain from doing anything except not to act in concert with the union. Otherwise each was free from all restraint.

Order affirmed.