**UNITED STATES v. INTERNATIONAL LONGSHOREMEN'S ASS'N et al.**

United States District Court,
S. D. New York.
Oct. 20, 1953.

See also D.C., 116 F.Supp. 262.

Herbert Brownell, Jr., Atty. Gen., Warren E. Burger, Asst. Atty. Gen., J. Edward Lumbard, U. S. Atty. for the Southern Dist. of New York, Edward H. Hickey, Atty., Dept. of Justice, Washington, D. C., for plaintiff.

George A. Brenner, New York City, for International Longshoremen's Ass'n.

Joseph Mayper, New York City, for New York Shipping Ass'n and Philadelphia Marine Trade Ass'n.

William H. Gorman, Baltimore, Md., for Steamship Trade Ass'n of Baltimore.

WEINFELD, District Judge.

This proceeding was commenced by the Attorney General of the United States pursuant to the National Emergencies provisions of the Labor Management Relations Act of 1947 (The Taft-Hartley Act) 61 Stat. 155, §§ 206–210, 29 U.S. C.A. §§ 176–180 (hereinafter also referred to as the "Act").

The defendants are one union and seven employer associations. The union and the employer groups were parties to collective bargaining agreements covering employees engaged in varied phases of water-front work in the North Atlantic ports from Hampton Roads, Virginia, to Portland, Maine. The agreements expired on September 30, 1953. For many weeks prior thereto the parties attempted to negotiate a new contract, but these efforts failed. Promptly upon the expiration of the existing contracts a strike was called by the union. Its effects were so immediate and far-reaching that on October 1, 1953, the President, acting under the National Emergencies provisions of the Act, appointed a Board of Inquiry to inquire into the issues involved in the dispute.[1]

■ The Board of Inquiry after hearing the parties to the dispute made its written report to the President on October 5, 1953. Thereupon the President directed the Attorney General to apply for relief as permitted by the Act. On the same day the Attorney General brought the present action for an injunction under § 208 of the Act and requested a temporary restraining order pending the hearing and determination of the Government's application. It appearing that a continuation of the strike would result in irreparable injury and endanger the national safety and health, this Court granted a temporary restraining order for a period of ten days;[2] and the matter was set down for a hearing on the injunction on October 13th. Upon the return day, the defendant-union appeared by its attorney, as did a number of the employer associations. Some of the employer associations defaulted. Counsel representing the various defendants conceded that the Government had established a prima facie case for the relief requested and further that if the affiants upon whose affidavits the temporary restraining order was based were to give oral testimony in open court at the hearing, they would testify substantially in accord with their respective affidavits. When requested to go forward to show cause why the injunction should not be granted, the employer groups consented to, and the union did not oppose, its issuance. Notwithstanding such consent and lack of opposition, the Court is required to set forth the reasons underlying the issuance of the injunction and to make appropriate findings of fact and conclusions of law.[3]

Discussion.

■ The jurisdiction conferred upon the Court where an injunction is sought by the Government under the National Emergencies provisions of the Taft-

1. § 206, 29 U.S.C.A. § 176; Executive Order, Oct. 2, 1953, No. 10490, 18 Fed. Reg. 6279, U.S.Code Congressional and Administrative News, 1953, p. 1058.

2. Rule 65(b), Federal Rules of Civil Procedure, 28 U.S.C.A.

3. Rules 65(d), 52, Federal Rules of Civil Procedure; Mayflower Industries v. Thor Corporation, 3 Cir., 182 F.2d 800; United States v. United Steelworkers of America, 2 Cir., 202 F.2d 132, 139; Cf. Inland Steel Co. v. United States, 306 U.S. 153, 59 S.Ct. 415, 83 L.Ed. 557.

Hartley Act is restricted.[4] Fundamental to the Court's jurisdiction to enjoin a strike (or a lockout) is a finding of two essential elements: (1) that the existing strike affects an entire industry or a substantial part thereof engaged in trade, commerce, transportation, transmission or communication among the several states or with foreign nations; and (2) if permitted to continue, it will imperil the national health or safety.[5]

As to the first element, it is self-evident that the maritime industry is one engaged in trade, commerce, and transportation among the foreign states and with foreign nations. And a mere recital of statistics indicates that the strike affects an entire industry or a substantial part thereof. Sixty thousand men engaged in various waterfront activities affecting incoming and outgoing ocean and coastal shipping along the North Atlantic seaboard from Hampton Roads, Virginia, to Portland, Maine, are involved in the dispute. Included within this area are the important ports of Boston, New York, Philadelphia, Baltimore and Hampton Roads.

The vessels using these ports and their facilities deliver imported supplies, materials of all descriptions and food for ultimate distribution by domestic inland carriers to governmental agencies and consignees throughout the entire country. The vessels also receive from shippers, governmental and private, all manner of cargo for delivery to foreign countries. Many of the products so imported or exported are vital directly or indirectly to our defense and security programs and foreign aid activities; others are important to the healthy functioning of our domestic economy and foreign trade.

The importance of the North Atlantic seaboard to the water-borne commerce of the United States is attested to by the fact that the total foreign trade in dry cargo tonnage handled by the five major ports for the year 1952 represented about 60% of the total dry cargo tons exported and imported in the ocean-going foreign trade of the United States. Thus the strike affects one of the most sensitive and vital industries of the nation.

That this strike if permitted to resume will imperil the national health or safety admits of no dispute. The strike had an immediate and devastating effect. The entire North Atlantic seaboard was paralyzed. Loading and unloading of ships ceased. Men remained idle, ships were immobilized. The North Atlantic shipping industry was at a standstill. This condition continued until the men returned to work following the issuance of the temporary restraining order. The proof submitted establishes that in five days from October 1st to October 6th, various governmental programs relating to the national defense and security were profoundly affected by the delay in the receipt of critical and strategic materials imported from abroad and normally entering through one or more ports in the area of the strike. The strike, if resumed, would, according to the evidence submitted, seriously retard and imperil vital defense activities.

---

4. The Act revested the Federal Courts with power to grant injunctions in limited situations arising out of labor disputes by creating an exception to the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq. See Amazon Cotton Mill Co. v. Textile Workers Union of America, 4 Cir., 167 F.2d 183, 186 et seq.; United States v. United Steelworkers of America, 2 Cir., 202 F.2d 132, 137.

5. § 208 of the Act. For cases treating in detail the operation of the National Emergencies provisions, see, e. g., United States v. International Union, United Mine Workers of America, D.C., 77 F. Supp. 563, affirmed 85 U.S.App.D.C. 149, 177 F.2d 29, certiorari denied 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535; United States v. International Union, United Mine Workers of America, D.C., 89 F. Supp. 179 and 89 F.Supp. 187, appeal dismissed and affirmed, 88 U.S.App.D.C. 341, 190 F.2d 865; United States v. International Longshoremen's and Warehousemen's Union, D.C., 78 F.Supp. 710; United States v. United Steelworkers of America, 2 Cir., 202 F.2d 132, affirming United States v. American Locomotive Co., D.C., 109 F.Supp. 78.

The Atomic Energy Commission, for example, requires various materials from foreign sources, several of which are still under priority allocations. A prolonged delay in the receipt of these materials would not only disrupt the Commission's production program but also delay construction schedules for new production facilities. In the light of current world conditions,[6] any delay, however slight, in a program so vital to national defense and security irrefutably establishes that continuation of the strike in this industry is a threat to the health and safety of the nation. A delay of a substantial period may be catastrophic.

But the proof goes much beyond this particular program, important as it is. There are other defense and related security programs authorized by the Congress in the national interest which would be seriously hampered were the strike to resume. Work stoppage on the docks would halt the import of such raw materials as chromite, manganese, antimony ore, copper, cobalt and tin, urgently needed by defense industries. These critical and strategic items which enter through the affected ports would soon be in short supply with consequent disastrous effect upon the national defense and security programs as well as on the national economy.

A stoppage of exports from the five ports would seriously curtail our European defense program and, in addition, would reduce essential exports to Latin America, to Africa, and to the Orient. Many of these exports are utilized to increase production abroad of vital materials and supplies needed by our country, which in turn are imported in large quantities through the ports of the North Atlantic seaboard. The exports are also aids in maintaining the domestic economies of friendly nations so that they can continue to contribute to the European defense program.

■ The underlying objectives and policies of the Mutual Security Act of 1951, 22 U.S.C.A. § 1651 et seq. are to maintain the security and to promote the foreign policy of the United States through military, economic and technical assistance to friendly countries in order to strengthen mutual security and individual and collective defenses of the free world. Programs aimed at carrying out these objectives will in large measure be defeated by any stoppage in the shipment of supplies, both military and nonmilitary, required by friendly countries for defense support, for the prevention of famine, and for other purposes deemed essential to United States foreign policy. The brief five day strike had, in fact, interferred with shipments of food intended for the East German Food Program, Greece, Pakistan, Jordan and other countries involved in the defense-support program.

Separate and apart from the havoc it would visit upon the various security programs, the strike, if resumed, would result in severe damage to the domestic economy. Essential food-stuffs, minerals, and raw materials required for the maintenance of the domestic economy form an important and large part of the imports. The non-delivery of these items would interfere with industrial activity in many areas of the country and cause widespread unemployment. The strike would disrupt the major portion of foreign commerce of the United States and would lead to the complete cessation of intercoastal shipping. In this instance the physical health and well-being of our citizens are directly involved. For example, New England depends on coastal shipping for the bulk of its coal supply for industrial and domestic use. A serious fuel shortage with the approach of winter would be injurious to the health of the people in that area and cause much suffering and hardship.

Instance after instance of disruption of our internal economy and interference with essential services are established as certain to flow from a renewal of the

---

**6.** The National Emergency declared by the President on December 16th, 1950, continues in effect. Proclamation No. 2914, 15 Fed.Reg. 9029, 50 U.S.C.A.Appendix note preceding section 1.

strike; there is no need to multiply examples here.

The Government has fully established its right to injunctive relief in order to protect the national health and safety. Accordingly, I make the following

### Findings of Fact.

1. On October 1, 1953, the President of the United States, acting under the National Emergencies provisions of the Labor Management Relations Act, 1947, 61 Stat. 155, Section 206, 29 U.S.C.A. § 176, issued Executive Order 10490, 18 Fed.Reg. 6279 whereby he appointed a Board of Inquiry to inquire into the issues involved in labor disputes between (1) steamship companies or employers who are engaged as operators or agents for steamships engaged in service from or to North Atlantic ports from Hampton Roads, Virginia to Portland, Maine; (2) contracting stevedores; (3) contracting marine carpenters; (4) or other employers engaged in related or associated pier activities, on the one side, and on the other, certain of their employees represented by the International Longshoremen's Association (hereinafter also referred to as the "ILA"). In said Executive Order, the President expressed the opinion that such disputes had resulted in a strike affecting a substantial part of the maritime industry, an industry engaged in trade, commerce, transportation, transmission or communication, among the several states and with foreign nations, which strike if permitted to continue would imperil the national health and safety.

2. The Board of Inquiry so convened by the President inquired into the issues involved in the disputes and rendered its written report to the President on October 5, 1953.

3. After receipt of the report, the President on October 5, 1953, in a letter to the Attorney General stated that in his opinion the unresolved labor disputes had resulted in a strike affecting an entire industry, or a substantial part thereof, engaged in trade, commerce, transportation, transmission or communication, among the several states and with foreign countries, which strike, if permitted to continue, would imperil the national health and safety.

4. The President thereupon directed the Attorney General, pursuant to the provisions of Section 208 of the Act, to petition in the name of the United States, any District Court of the United States having jurisdiction of the parties, to enjoin the continuance of such strike where such action was necessary to secure a resumption of trade, commerce, transportation, transmission or communication, among the several states and the foreign nations and for such other relief as may be necessary or appropriate.

5. Thereupon, on October 5, 1953, the Attorney General commenced this action on behalf of the United States of America in this district, against the following named defendants, to wit:

The New York Shipping Association,

The Steamship Trade Association of Baltimore, Inc.,

The Boston Shipping Association, Inc.,

The Philadelphia Marine Trade Association,

The Hampton Roads Maritime Association, Inc.,

Portland Deep Water Steamship Lines and Contracting Stevedores and the International Longshoremen's Association.

6. (a) Upon filing the verified complaint and the accompanying affidavits and exhibits and after due consideration thereof, this Court at 8:30 p. m. Eastern Standard Time, on October 5, 1953, issued an order directed to all defendants requiring them to show cause on October 13, 1953, why an injunction should not issue pursuant to the provisions of § 208(a) of the Act. At the same time, it appearing that irreparable injury and harm would result to the plaintiff pending the bearing of the aforesaid motion, the Court issued a temporary restraining order as prayed for by the plaintiff, accompanied by a statement defining the injury, why it was irreparable and why

it was granted without notice, pursuant to Rule 65 of the Federal Rules of Civil Procedure.

(b) The temporary restraining order provided for its expiration at 8:30 p. m. EST on October 15, 1953 unless for good cause shown the order should be extended, or unless the defendants consent that it be extended for a longer period. Thereafter the defendants duly consented to its extension to October 20, 1953 at 8:30 p. m. EST.

7. Copies of the verified complaint, affidavits annexed thereto and of the order to show cause, together with the restraining order with the attached statement issued by the Court were published and duly served upon each of the defendants herein on or before Saturday, October 10, 1953, pursuant to the terms of the temporary restraining order issued as aforesaid.

8. The defendant ILA upon receipt of notification of the issuance of the temporary restraining order on October 5, 1953, promptly announced that it would direct compliance with the said restraining order by its membership.

9. On or about October 6, 1953, the defendant ILA ceased the strike which had been in existence on October 5, 1953, and the return of the majority of ILA members, acting in concert, to their normal employment occurred only because of the issuance of the temporary restraining order by this Court on October 5, 1953.

10. Unless the Court grants an injunction the defendant ILA upon the expiration of said temporary restraining order will resume said strike in the maritime industry from Hampton Roads, Virginia, to Portland, Maine.

11. This suit was commenced under the National Emergencies provisions of the Act, §§ 206–210, 29 U.S.C.A. §§ 176–180.

12. The strike by the defendant ILA consisted of a concerted stoppage of work on the part of the said defendant. This work stoppage was a strike on the part of the ILA and did not constitute the exercise of the right of individual employees to quit their labor as set forth in § 502 of the Act, 29 U.S.C.A. § 143.

13. (a) The strike on the part of the ILA resulted from unresolved labor disputes between employers (or associations which represented such employers in collective bargaining conferences), who are (1) steamship companies or who are engaged as operators or agents for ships engaged in service from or to North Atlantic ports from Hampton Roads, Virginia to Portland, Maine, or from or to other ports of the United States or its territories or possessions, (2) contracting stevedores, (3) contracting marine operators, or (4) other employers engaged in related or associated pier activities, and certain of their employees represented by the ILA.

(b) The Board of Inquiry reported that there were five major items in dispute. One of these, that of union representation, was referred to by the Board of Inquiry as a "most sensitive" one. On September 23, 1953, the defendant-union was expelled by its parent organization, the American Federation of Labor, which then chartered a new union to undertake representation of the longshoremen. The new union, the American Federation of Labor International Longshoremen's Association (not originally named as a defendant, but as to whom an application to join as a party defendant in this action is pending under Rule 21 of the Federal Rules of Civil Procedure) on September 28th, prior to the expiration of the existing contracts, and while the defendant-union and the employers were in negotiation, served notice that it intended to file a representation petition with the National Labor Relations Board for the purpose of being designated as bargaining agent for the men. Since the issuance of the temporary restraining order, the new union, on October 9, 1953, filed a petition with the National Labor Relations Board for its certification as the exclusive bargaining agent or representative for all employees engaged in longshore operations. As the Board of Inquiry pointed out in its report, until

the representation rights of the contending unions are determined by the National Labor Relations Board, there is little likelihood of an accord being reached because of possible charges of unfair labor practices.

14. The various unresolved issues in the dispute have resulted in the subject strike which affects a substantial part of the maritime industry of the United States and which also affects a substantial part of the maritime terminal industry of the United States.

15. (a) The maritime industry of the United States is engaged in trade, commerce, transportation, transmission or communication among the several states and with foreign nations.

(b) The marine terminal industry of the United States is engaged in trade, commerce, transportation, transmission or communication among the several states and with foreign nations.

16. The strike, which commenced on October 1, 1953 and continued until October 6, 1953 when it was terminated following the issuance of the temporary restraining order of this Court, had substantially paralyzed the shipping industry from Hampton Roads, Virginia to Portland, Maine and interfered with and delayed shipments from or to other ports of the United States and its territories or possessions.

17. The strike in existence up to October 6, 1953, if permitted to resume or to continue, will imperil the national health or safety in the following, as well as in other, respects:

a. It would seriously disrupt inland and off-shore transportation, storage and port operation, thereby resulting in congestion and dislocation of the nation's transportation system and its economy.

b. It would again, as it did prior to the entry of the restraining order herein, result in the disruption of 75% of the steamship mail services and hamper the post office department in the expeditious handling and delivery of all classes of mail vital to the national defense effort.

c. It would substantially delay the atomic energy program through failure to receive shipments of strategic materials necessary to the defense and security of the nation. A prolonged delay in the receipt of these materials would not only disrupt the Commission's production program but also delay construction schedules for new production facilities.

d. It would again, as it did prior to the entry of the restraining order, stop the shipment of both military and non-military supplies to friendly countries which urgently need these shipments not only for defense but to prevent famine and for other reasons essential to the foreign policy of the United States in accordance with the various acts of Congress.

e. It would again, as it did prior to the entry of the restraining order, cause a stoppage of shipments of food intended for the East German Food Program, Greece, Pakistan, Jordan and other countries involved in the defense support programs.

f. It would delay completion of the mobilization program and completion of the national stockpile, which programs are essential to the national defense.

g. It would interfere with the movement of essential cargo necessary to maintain and support the fighting forces of the nation and its allies.

18. Such results, if the strike is permitted to resume or to continue, would in addition to imperiling the national health and safety, cause irreparable damage and injury to the United States of America, for which there is no adequate remedy at law.

### Conclusions of Law.

1. This action was properly instituted under the National Emergencies provisions of the Labor Management Relations Act of 1947, §§ 206–210, 29 U.S. C.A. §§ 176–180.

2. The statutory provisions of Sections 206 to 208 of the Act and all requirements therein contained were in all

respects duly and legally complied with, both prior to and in the commencement of this suit by the United States of America.

3. The Court has jurisdiction of the subject matter of this suit and of the parties.

4. The work stoppage was a strike on the part of the ILA and did not constitute the exercise of the right of individual employees to quit their labor as set forth in Section 502 of the Act.

5. The strike is one affecting a substantial part of an industry engaged in trade and commerce, transportation, transmission and communication among the several states and with foreign nations as well as between the United States and certain of its territories or possessions. The strike if permitted to continue or to be resumed, will imperil the national health or safety.

6. The strike if it is permitted to be resumed will cause irreparable injury to the United States of America and to labor, industry and commerce, as well as to the national economy of the United States, for which there is no adequate remedy at law.

7. The plaintiff, the United States of America, is entitled to the relief prayed for.

Decree to enter accordingly.