**UNITED STATES v. INTERNATIONAL LONGSHOREMEN'S ASS'N et al.**

United States District Court,
S. D. New York.
Oct. 23, 1953.

Herbert Brownell, Jr., Atty. Gen., Warren E. Burger, Asst. Atty. Gen., J. Edward Lumbard, U. S. Atty. for the Southern Dist. of New York, Edward H. Hickey and John G. Roberts, Attys., Dept. of Justice, Washington, D. C., for plaintiff.

Woll, Glenn & Thatcher, Washington, D. C., Katz & Jaffe, Peter J. Johnson, Howard Schulman, and Isadore Katz, New York City, for American Federation of Labor-International Longshoremen's Ass'n.

George A. Brenner, New York City, for International Longshoremen's Ass'n.

Joseph Mayper, New York City, for New York Shipping Ass'n and Philadelphia Marine Trade Ass'n.

William H. Gorman, Baltimore, Md., for Steamship Trade Ass'n of Baltimore.

WEINFELD, District Judge.

This is a motion by the plaintiff United States of America to join as a party defendant the American Federation of Labor-International Longshoremen's Association (hereinafter also referred to as the "New Union"), pursuant to Rule 21 of the Federal Rules of Civil Procedure, 28 U.S.C.A.[1] The action was originally instituted against another union, the International Longshoremen's Association (hereinafter also referred to as the "Old Union") and seven employer groups under the National Emergencies provisions of the Labor Management Relations Act, 1947, the Taft-Hartley Act.[2]

On October 5, 1953, on the Government's application, an ex parte temporary restraining order was signed enjoining the Old Union from engaging in or continuing a strike which had been in effect since October 1, 1953, following the expiration of collective bargaining agreements with the employer-defendants. The temporary order extended to and included the defendant-employer groups, and in substance enjoined both strikes

---

1. "Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just."

2. 61 Stat. 155, §§ 206–210, 29 U.S.C.A. §§ 176–180.

and lockouts in the Maritime Industry of the North and Central Eastern United States.

The strike during the five days of its continuance tied up the entire Maritime Industry along the North Atlantic seaboard from Hampton Roads, Virginia, to Portland, Maine.

On October 20, 1953, an injunction against strikes or lockouts was issued against the Old Union and the employer associations to remain effective until vacated following the so-called eighty day "cooling off" period in accordance with the Act.[3] Familiarity is assumed with the Court's Opinion, Findings of Fact, and Conclusions of Law upon which that injunction was based. 116 F.Supp. 255. It is sufficient to say for the purposes of the present motion that vital defense and security programs and the various foreign aid programs, all intended in the national interest, were profoundly affected by the strike even during its short duration and the strike's continuance would have had disastrous effects on the nation's security efforts and economy.

One of the central issues in the dispute leading to the strike was that of union representation of the men—an issue characterized by the President's Board of Inquiry in its report to him on October 5, 1953, as both "major" and "most sensitive." The Old Union had been expelled by its parent organization, the American Federation of Labor, on or about September 23, 1953, and a new union chartered, the one now sought to be brought in as a party defendant. The expulsion took place while the Old Union and the employer groups were engaged in negotiations for the renewal of the existing contracts. The New Union, even prior to October 1st, the expiration date of the existing contracts, to which it was not a party, served upon the employers notice of intention to file a representation petition with the National Labor Relations Board for the purpose of being designated as bargaining agent for certain of the employees in the industry. Thereafter, on or about October 9th, after the Old Union and the employers had been enjoined from continuing in a strike or lockout, the New Union filed a formal representation petition with the National Labor Relations Board for its certification as the exclusive bargaining agent for all employees engaged in longshore operations. The Government then filed an amended complaint, and in addition to incorporating the allegations of the original complaint with all attachments and exhibits, it alleged in substance that by the New Union's claim and assertion of rights and standing as a bargaining agent for the employees involved in the strike the New Union becomes a necessary party defendant in these proceedings; that by the assertion of its claim that it represented a majority of the employees, the New Union has created and there now exists an unresolved labor dispute in which the parties are on one hand the employers and their associations, and on the other hand, the New and the Old Unions; that any proceeding or order which does not operate equally upon the contending associations which claim to represent the same employees is inadequate to implement the relief contemplated by the National Emergencies provisions of the Labor Management Relations Act.

Pending the hearing and determination of the Rule 21 motion, a temporary restraining order was granted against the New Union. The Government now seeks to continue the injunction against the New Union for the full period allowable under the National Emergencies provisions of the Taft-Hartley Act.

■ The New Union opposes its joinder as a party defendant. It contends that since the amended complaint alleges no activities on its part in support or furtherance of the strike, no cause of action has been asserted against it and it has no adjudicable interest in the subject matter of this cause. Its claim in

3. Section 209(b).

substance is that it neither called nor participated in the strike that led to the invoking of the procedures authorized by the Taft-Hartley Act and, therefore, it should not be enjoined. The question presented is not without difficulties. But I am persuaded that the Court's jurisdiction under the National Emergencies provisions of the Act to grant injunctions against the interested parties to a dispute which gave rise to a strike, does not depend upon the existence of a justiciable controversy with respect to the parties sought to be enjoined. Rather, it is the fact that a strike or lockout exists or is threatened which imperils the nation's health and safety which empowers the Court to issue its decree to all involved in the dispute.

■ The broad objectives of the Act and its underlying policy is to provide a means for the protection of the national health and safety whenever it is imperiled by a strike or lockout in an entire industry or a substantial part thereof engaged in interstate or foreign commerce.[5] To achieve that objective, Congress authorized the issuance of injunctions against such strikes or lockouts for a limited period, the eighty day "cooling off" period, when "the parties to the labor dispute giving rise to such order"[6] are placed under a duty to make every effort to adjust and settle their differences with the assistance of administrative governmental agencies.[7]

■ Under the Act the most peaceful strike may be banned during the eighty day period if the Court finds it runs counter to the public interest and affects the national welfare. In exercising jurisdiction under the National Emergencies provisions of the law, the Court acts in the public interest and not in the adjudication of private rights of the contending parties.[8] Viewed against

this objective and the broad policies and purposes of the entire Act,[9] the fact that the New Union did not call the strike and that it has engaged in no unlawful conduct is irrelevant. It is the fact of the strike and its impact upon the national interest that is relevant. It is the fact that the New Union is a party to the dispute that led to the strike that is relevant. It is the fact that its activities contributed to the calling of the strike that is relevant. The Government's right to enjoin the strike or lockout does not hinge on violation of federal law, breach of agreement, which union or unions represent the men, which union called the strike, who is the employer, or the merits of the unresolved controversy. These or other issues which are at the core of the dispute amongst the contending parties are not the criteria which give rise to the Court's restricted power to issue injunctions in national emergencies. Jurisdiction flows from these essential elements: (1) a strike or a lockout, actual or threatened; (2) such strike or lockout is in an entire industry or a substantial part thereof, engaged in interstate or foreign trade or commerce; (3) if permitted to continue or occur, such strike or lockout will imperil the national health and safety. Once these findings are made the Court is empowered to enjoin the strike or lockout for the eighty day period.

There remains for consideration the question as to whether under the facts here presented the New Union should be joined as a party defendant and the decree extended to include it. The New Union by asserting representation as collective bargaining agent for the men during the progress of negotiations by the Old Union for an extension of the previously existing contracts, touched off one of the most crucial issues of the controversy that eventuated in the strike.

5. United States v. United Steelworkers of America, 2 Cir., 202 F.2d 132, 137.

6. Section 209(a).

7. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 586, 657, 72 S.Ct. 863, 96 L.Ed. 1153.

8. United States v. United Steelworkers of America, 2 Cir., 202 F.2d 132, 139.

9. Section 1(b).

It became a central figure in the dispute involving it, the Old Union and management. That it was and is a participant therein is not open to question either factually or legally. Under the National Labor Relations Act the term "labor dispute" is defined:

"Sec. 2(9) The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee." [10]

That the New Union was involved in the controversy even before the strike, is evident from its claim of representation prior to the termination of the old agreements. It is true that its formal petition for certification was not filed with the National Labor Relations Board until after the Board of Inquiry had met and made its report and that the New Union did not present its position to the Presidential Board of Inquiry.[11] Nonetheless the Board aware of its position and that it had served upon the employers "notice of intention" to claim representation, not only considered this issue but recognized it—as indeed it must be recognized—as of great significance in the controversy.

■ As to its contention that it is not engaged in a strike actual or threatened, the fact is that the men for whom it asserts representation were on strike from October 1st to October 6th. Furthermore, prior to October 1st there had developed and there now exists a confused situation involving a conflict between the two unions for status as bargaining agent for employees in the industry. At this time it is not clear, and understandably so, as to which Union speaks for which employees or group of employees, and only settlement amongst all the parties to the dispute during the eighty day "cooling off" period or a formal election can resolve the impasse. Under the circumstances, any injunction to prevent effectively the imperiling of the national welfare during the eighty day period, must encompass both unions, if it is not to lose its vigor by being tossed between the two. Concerted action by one or more of the parties to a dispute, no matter how innocent, may reactivate the strike or cause other stoppage or interference with the continued operation of the industry, thereby again imperiling the national health and safety. It does not appear to have been the purpose of the Act to wait for the situation to erupt again before extending its decree to all involved in the initial causes which lead to the onset of the interruption of work.

■ Moreover, the purpose of the Act is not merely to secure continuance of operation during the eighty day period. An equally important function of the Court mandate is to bring into play the provisions of Section 209(a), which look toward the resolution of the differences among the parties by voluntary effort with the aid of administrative machinery. It is true that the Court's judicial function ends with the issuance of the decree,[12] but inextricably wound up with the decree is activation of the duty imposed upon the disputants to attempt to settle their differences. Section 209(a) provides:

"Whenever a district court has issued an order under section 178 of

---

10. 61 Stat. 138, § 2(9), 29 U.S.C.A. § 152(9).

11. The New Union has waived any claim with respect to preliminary steps as to the appointment of the Presidential Board of Inquiry, the Union's appearance before the Board and the inclu-

sion in the Board's report of a statement of its position. §§ 206–208.

12. Except for unlawful conduct with respect to the decree and the entry of an order dissolving the decree at the end of the eighty day period.

this title enjoining acts or practices which imperil or threaten to imperil the national health or safety, it shall be the duty of the parties to the labor dispute giving rise to such order to make every effort to adjust and settle their differences, with the assistance of the Service created by this chapter. Neither party shall be under any duty to accept, in whole or in part, any proposal of settlement made by the Service." [13]

In issuing the injunction the Court here "acts in aid of the settlement of a labor dispute" [14] by requiring the parties to the dispute to seek adjustment through their own efforts aided by various agencies. In this situation, if the Court's decree is to have vitality in achieving this purpose, it must extend to all "the parties to the labor dispute giving rise to such order * * *" who are under the duty to make every effort to adjust and settle their differences. The decree entered against the Old Union and all the defendants contains a decretal clause requiring the parties to comply with Section 209. Significantly, too, its direction runs to the employer groups. Unless made a party to this suit, this direction cannot be made to the New Union.

Counsel for the Union has aptly phrased the Court's decree as a "judicial holding operation" for the eighty day period intended to prevent interruption of work and to require the parties to the dispute to exert all efforts to adjust their differences.

To exclude from the embrace of this holding action one of the principal contenders and so free it of the duty imposed upon all the parties to the dispute under Section 209(a) would defeat a principal purpose of the Act—to achieve possible settlement of their differences. That the prospect of successful resolution of the issues in controversy is dim, does not relieve any of the parties from attempting efforts to reach an accord.

It is to be remembered that during this period the Act contemplated not only the voluntary efforts of the parties but the force of public opinion in addition to governmental mediation and conciliation aids. The pages of history are complete with seemingly intractable situations yielding satisfactory solutions. The fact that a representation proceeding is pending before the National Labor Relations Board does not preclude discussion of other issues present in the situation. The employer groups urge they may subject themselves to an unfair labor charge if they sign up with one or the other union pending certification. There is, of course, no compulsion under the Act for any of the contending parties to accept any proposal of settlement. There is the duty, however, upon all of them, the Unions and Management alike, "to make every effort to adjust and settle their differences with the assistance of the service created by this Act." In order, then, to assure performance of that duty, the Court's decree must extend to all participants in the unresolved issues which directly resulted in the strike or lockout and gave rise to the Court's decree.

The decree to be entered herein, in addition to directing the parties to make every effort to adjust their differences in accordance with applicable provisions of law, shall also contain the protective clauses of the existing temporary restraining order, which, in substance, provides that it shall not be construed to prevent or restrain individuals from joining or assisting labor organizations to bargain collectively through representatives of their own choosing or to engage in other concerted activity for the purpose of collective bargaining or from engaging in lawful activity of any character to secure or solicit new members, engage in legitimate union activities or to persuade individuals by any legitimate means to join or assist such union or to solicit support in a legiti-

13. 29 U.S.C.A. § 179(a).

14. United States v. United Steelworkers of America, 2 Cir., 202 F.2d 132, 139. 139.

mate manner for collective bargaining representation in any manner permitted by law, so long as such activities do not violate numbers 1, 2 and 3 of the Court's order. The order shall also include the further provision that it shall not be construed to require an individual to render labor or service without his consent, nor to make the quitting of his labor or service by an individual employee an illegal act.

Plaintiff's motion to make the defendant a party to this proceeding pursuant to Rule 21 of the Federal Rules of Civil Procedure and for the issuance of an order against it pursuant to the National Emergencies provisions of the Act is granted. Decree to enter accordingly.