**UNITED STEELWORKERS OF AMERICA, AFL–CIO, and its Local 2958, Appellants,**

v.

**UNITED STATES of America et al., Appellees.**

**No. 20665.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 22, 1966.

Decided Dec. 23, 1966.

Mr. Elliot Bredhoff, Washington, D. C., for appellants. Messrs. Michael H. Gottesman and George H. Cohen, Washington, D. C., also entered appearances for appellants.

Mr. Carl Eardley, Mr. Harland F. Leathers, Attys., Dept. of Justice, for appellee United States.

Mr. Guy Farmer, Washington, D. C., for appellee Union Carbide Corp.

Before FAHY, McGOWAN and LEVENTHAL, Circuit Judges.

## JUDGMENT

PER CURIAM.

On consideration of the record on appeal from the United States District Court for the District of Columbia, and the pleadings filed by the parties herein, and counsel for the parties, at the time of hearing on appellants' motion for stay, having stipulated that this case may be treated as submitted for final decision on the merits and pleadings now on file herein in this cause, it is, for the reasons set forth in the accompanying opinion,

Ordered and adjudged by this court that the order of the District Court appealed from in this cause be, and it is hereby, affirmed, and it is

Further ordered and adjudged by this court that the order of this court entered December 22, 1966, granting appellants' motion for stay shall remain in effect until 5 P.M. December 23, 1966.

PER CURIAM:

The District Court, on December 21, 1966, issued a preliminary injunction, under the National Emergencies provisions of the Labor Management Relations Act, 29 U.S.C. §§ 176–180 (1964), against the continuation of a strike by the Steelworkers at a Union Carbide plant in Kokomo, Indiana. The following day the matter came on before us on the union's motion for a stay pending appeal. In the course of the argument of that motion, all parties stipulated that the case should be regarded as submitted to us on the merits. In the light of this development, we stayed the injunction until 5:00 P.M. on December 23. For the reasons set forth below in necessarily brief compass, and pursuant to a purpose to do so communicated by us to the parties on the afternoon of December 22, we affirm the District Court and decline to extend our stay beyond the originally appointed time.

Eleven Union Carbide plants in all have been struck, but injunctive relief has been sought by the United States in respect of only one. This is the so-called Stellite Division, which produces a high temperature metal alloy used by aircraft engine manufacturers. As contemplated by the Act, the President convened a board of inquiry and, upon receipt of its findings, directed the Attorney General to seek an injunction ending the strike for 80 days. The matter was heard in the District Court on affidavits, and upon oral and written representations, submitted by the parties. The injunction issued upon findings of fact and conclusions of law formulated by the District Court after this hearing.

The central finding is that the strike, if permitted to continue, "will affect a substantial part of the military aircraft engine industry" engaged, within the meaning of the Act, in interstate and foreign commerce, or in the production of goods for such commerce. It is further found that the strike will affect the National Safety in that:

(1) A manufacturer supplied by the Stellite Division is the sole producer of engines and spare parts for military aircraft known as the F-4, the RF-4, and the F-104. All these aircraft are variously being used by the Navy and Air Force in combat and reconnaissance operations in Southeast Asia. The metal alloy in question, of which the Stellite Division is the major producer, is required in the fabrication of combustion liners which enable the engines to perform under the extremely high temperatures generated by the burning of jet engine fuel. Since the only other producer of this alloy under license from the Stellite Division is supplying other priority requirements, there is no other source available to enable the manufacturer to meet its delivery schedules, and existing stocks will shortly be exhausted, all to the detriment of our national safety.

(2) The Stellite Division also produces turbine blades essential in the engines which power the helicopters known as the CH-53, the CH-46, and the SH3D. The first two of these classes are used by the Marine Corps in combat in Southeast Asia, and the last is used in the Navy's anti-submarine warfare pro-

grams. There is no alternate source of the castings for these blades which can maintain the existing production schedules of the manufacturer making these engines.

(3) The Stellite Division supplies certain first and second stage turbine blades and vanes for the engines powering the UH-1 and CH-47 helicopters. These aircraft are used by the Army in Southeast Asia for combat, as well as for the transportation of troops, supplies, and artillery, and for fire support of ground troops. The strike has resulted in inadequate stocks of blades and vanes to permit the rebuilding of old engines to replace worn and combat-damaged engines in Southeast Asia, and to maintain production schedules of new engines.

It is further found that, by reason of the foregoing circumstances, the strike will result in an irretrievable loss of time in the supply of weapons systems essential to the national defense and security of the United States, with particular reference to current combat operations in Southeast Asia. There are no other sources from which sufficient quantities of the necessary materials and parts can be obtained in time to maintain levels of aircraft and helicopter engines requisite to meet adequately our military necessities, all to the imperilment of our national safety, and with irreparable damage to the United States for which there is no adequate remedy at law.

Although the union does not accept these findings, the principal thrust of its argument to us was, by its own characterization, not directed towards overturning them. It asserts, rather, that it is not enough for a successful invocation of Taft-Hartley merely to establish that the ending of the strike would relieve pressures antipathetical to our national safety. There must, in addition, be a showing that the strike, in the language of the Act, "affects an entire industry or a substantial part thereof"; and, so it is said, the District Court's finding to this effect is, on this record, conclusionary at best.

■ We do not agree. To the extent that the union's position derives from a contention that Congress conceived of the emergency provisions of Taft-Hartley as confined to the ending of work stoppages in the industry in which the striking employees are immediately engaged (in this instance, the metal alloys industry as distinct from the manufacture of military aircraft engines), it is disposed of to our satisfaction by United States v. United Steelworkers (American Locomotive Company), 202 F.2d 132 (2d Cir. 1953), cert. denied before judgment, 344 U.S. 915, 73 S.Ct. 337, 97 L.Ed. 705. In any event, the President did not direct the invocation of Taft-Hartley in respect of the metal alloys industry. His problem was with the effect of the strike upon the military aircraft engine industry; and, in our view, any strike which affects that industry, or a substantial part thereof, falls within the reach of the Congressional concern which gave rise to the emergency provisions of Taft-Hartley. Thus, the availability of those provisions in this case turns upon whether there is in fact an industry identifiable as the military aircraft engine industry; and, if there is, whether that industry has, either in its entirety or in substantial part, been affected by this strike to the jeopardy of our national safety.

■ The first part of this inquiry presents minimal difficulties.[1] That

---

1. The union's affidavits assert that there is only one aircraft engine industry, making engines for both military and civilian uses. But these same affidavits indicate that some 23% of all engines produced are for military purposes, and that 29% of all the employees of this allegedly single industry worked on military engines, producing 18% of the total dollar volume of shipments. These figures impress us as supporting a discernible division between military and civilian production. It is also conceded that the strike in issue may affect as many as 16,500 workers, representing 13% of the total industry employees. Further, the union's affidavits indicate that there is no dispute that the alloy made by the Stellite Division is a

there is in this country a tangible commitment of extensive resources of capital, technological skill, and manpower to the building of aircraft engines designed for use in military aircraft is evident from this record, especially when read with the common sense which should inform the judicial process as any other. The President, in using this term, was not devising an imaginary construct, nor was the District Court.

■■ In respect of the second branch of the inquiry, the statute does not embody an all-or-nothing approach. The District Court did not have to find that the "entire" military aircraft engine industry was affected, but only that a significant segment of it was. This record arguably does not admit of an identification in concrete terms of the total resources of this country employed in the manufacture of military aircraft engines. But, in the light of what is common knowledge of the magnitude of the effort this nation is being called upon to make in Southeast Asia, it is impossible to read what is in this record of the types and functions of the aircraft involved without concluding that their availability in adequate numbers to every branch of the armed services rests upon a resource commitment of a very substantial nature indeed. Our industrial might—in aircraft engine manufacture as elsewhere—is great, but it is not unlimited. We would over-estimate it sadly if we were to conclude, on this record, that an effort of very substantial proportions is not required of the military engine aircraft industry to keep these planes and helicopters moving steadily to the area of critical need.

It may be, as the union urges, that there are means other than Taft-Hartley by which this strike could be ended. But the question now is whether Congress intended the limited restrictions of Taft-Hartley upon the right to strike to be available to the President under the circumstances which have—rationally, we think—been found to obtain here. We do not find the District Court's answer to be wanting in either factual or legal foundation. Its judgment is accordingly

Affirmed.

---

component of the engines powering the particular types of aircraft identified in the District Court's findings. There is some effort by the union to assert that other sources of the alloy can be found, but we do not think there is any serious showing that these could meet within any reasonable time the crisis which has prompted the President to act.