**UNITED STATES of America**
v.
**UNITED STEELWORKERS OF AMERICA, Appellant, et al.**
No. 13056.

United States Court of Appeals
Third Circuit.

Argued Oct. 22, 1959.
Decided Oct. 27, 1959.

Hastie, Circuit Judge, dissented.

678

Arthur J. Goldberg, David E. Feller, Elliot Bredhoff, Jerry D. Anker, Washington, D. C., for appellant.

John C. Bane, Jr., Pittsburgh, Pa., for iron and steel producing companies.

William Kelly Montague, Duluth, Minn., for a number of independent ore companies.

George Cochran Doub, Donald MacGuineas, Washington, D. C., for Government.

Before BIGGS, Chief Judge, and GOODRICH and HASTIE, Circuit Judges.

BIGGS, Chief Judge.

The suit at bar was instituted by the United States, *parens patriae*, against

United Steelworkers of America (the "Union"), an unincorporated labor union, representing among others, employees in the steel industry, which is engaged in trade, commerce, and transportation among the several States and with foreign nations and in the production of goods for commerce as defined by the Labor-Management Relations Act, 1947, as amended, 29 U.S.C.A. § 141 et seq., 61 Stat. 136 et seq. The defendants, ninety-six in number, (the "Steel Companies") are variously engaged in one or more of the stages of steel production, including the mining and transporting of iron ore, the operation of blast furnaces for the conversion of iron ore into pig iron, the production of steel ingots, the rolling and shaping of steel ingots into steel products and in the fabricating of finished products.

Collective bargaining agreements between the Union and the Steel Companies expired on June 30, 1959, and unresolved labor disputes between the Steel Companies and their employees represented by the Union as to the terms and conditions of new agreements resulted in strikes of the employees commencing on July 15, 1959 and continuing until the present time. On October 9, 1959, the President of the United States issued Executive Order No. 10843 creating a Board of Inquiry, 29 U.S.C.A. §§ 176 and 177, to inquire into the issues involved in the labor disputes, and in the Executive Order referred to, stated that in his "opinion" the strike was affecting a substantial part of an industry engaged in trade, commerce and transportation among the several States and with foreign nations and in the production of goods for commerce, and that, if permitted to continue the strikes would imperil the national health and safety. 29 U.S.C.A. § 176. The Board of Inquiry convened and inquired into the issues involved in the labor disputes and made its report as required by law on October 19, 1959. Upon its receipt the President filed the report with the Federal Mediation and Conciliation Service, making its contents available to the public, and instructed the Attorney General of the United States to institute the instant proceedings in the court below.

That court, after extensive arguments and stipulations by the parties whereby they waived service of process and submitted themselves to the jurisdiction of the court and also agreed that the hearing on the petition and affidavits without oral testimony should be a final one, entered an injunction which ordered the Union and its officers and agents to end the strike and also required the Steel Companies to make their plants available for the Union members so that they might resume work therein. This injunction by the terms of the Act must be dissolved in 80 days, 29 U.S.C.A. § 180. The Union has appealed from this injunction. The Judgment is a final one, 28 U.S.C.A. § 1291. No jurisdictional question in the ordinary sense is presented here.

### The Constitutionality of the Statute.

We are met *in limine*, however, with a constitutional challenge asserted by the Union as to the capacity of the Court below to act in this matter.[1] The

---

1. Although ordinarily we think of federal courts being classified only as District Courts, Courts of Appeals, and the Supreme Court of the United States, there is also another classification of federal courts, that of "constitutional" and "legislative" courts. The former, also known as "Article III courts," are created in accordance with Article III, Section 1 of the Constitution which declares that "the judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." These "constitutional courts" are subject to the jurisdictional restrictions of Article III, Section 2, the most important of which, for present purposes, is the exercise of judicial power only in a justiciable "case or controversy," and the judges of these courts have the protection of Article III, Section 1 in that they hold office during good behavior and cannot have their compensation diminished during their continuance in office.

"Legislative" or "Article I courts," on the other hand, do not have such jurisdictional limitations nor do the judges

Union relies on Article III, Section 2 of the Constitution which limits the courts of the United States to the judicial function of adjudicating justiciable controversies, citing National Mutual Ins. Co. of District of Columbia v. Tidewater Transfer Co., 1949, 337 U.S. 582, 69 S. Ct. 1173, 93 L.Ed. 1556. Put shortly, it is the contention of the Union that there was no "case or controversy" before the court below which it could adjudicate in the sense required by the Constitution. In this connection the Union points out that Section 178, Title 29, U.S.C.A., states that the court "shall have jurisdiction to enjoin any such strike * * *" but, it contends, an injunction can issue lawfully only if it is employed as a remedy to enforce a preexisting legal duty; that here the injunction creates the right and also in the same breath, enforces it. The Union relies on the kind of classic equity proceedings where an injunction is issued to prevent the continuance of a tort, to compel performance of a contract, or to enforce a duty already imposed by statute. The

Union concedes that both it and the Steel Companies had and have a duty to bargain collectively in good faith and if it had failed to do so sanctions could be imposed upon it under the National Labor Relations Act because of such failure. But the Union argues that while there is a controversy between it and the Steel Companies that controversy was not before the court below in constitutionally justiciable form.

Unfortunately, though the Act is over twelve years old, we have found but one reported case which directly adjudicates this issue of constitutionality under Article III, Section 2; viz., United States v. United Steelworkers of America, 2 Cir., 1953, 202 F.2d 132, 138–139, affirming United States v. American Locomotive Co., D.C.W.D.N.Y.1952, 109 F.Supp. 78, certiorari denied 1953, 344 U.S. 915, 73 S.Ct. 337, 97 L.Ed. 705 (Certiorari in this case was applied for and denied prior to the adjudication in the Court of Appeals.). Cf. Youngstown Sheet & Tube Co. v. Sawyer, 1952, 343 U.S. 579, 586, 72 S.Ct. 863, 96 L.Ed. 1153.[2]

thereof have the protections afforded to judges of "Article III courts." The "legislative courts" are created by Congress as a "necessary and proper" adjunct to its enumerated powers under Article I, Section 8 of the Constitution; such courts may perform legislative and administrative as well as judicial functions. Courts which have been held to be legislative courts include the Territorial courts, the Court of Customs and Patent Appeals, the Customs Court, and the Court of Claims. See 1 Moore, Federal Practice § 0.4[3] (2d ed. 1959). The three courts last named, however, have been made constitutional courts by Acts of Congress which need not be detailed here.

The District Courts held in the various States and the Courts of Appeals for the First through the Tenth Circuits are "constitutional courts" as is the Supreme Court of the United States. The United States District Court and Court of Appeals for the District of Columbia Circuit are "legislative courts" for some purposes and "constitutional courts" for other purposes. Id. at § 0.4[2].

For a general discussion of the legislative-constitutional court dichotomy see Hart & Wechsler, The Federal Courts

and the Federal System 340–72 (1953), and 1 Moore, supra, at § 0.4.

2. There are, however, some thirteen other cases cited in the brief of the United States in which the provisions of Section 178, Title 29, U.S.C.A., were enforced seemingly without constitutional questions being raised. They are as follows: United States v. Carbide and Carbon Chemicals Corp., Civil No. 1093, E.D. Tenn., March 19, 1948 (no opinion); United States v. National Maritime Union (C.I.O.), Civil No. 46–299, S.D.N.Y., June 14, 1948 (unreported); United States v. National Maritime Union (C.I.O.), Civil No. 25686, N.D.Ohio, June 14, 1948 (no opinion); United States v. International Longshoremen's and Warehousemen's Union (C.I.O.), D.C.N.D. Cal.1948, 78 F.Supp. 710; United States v. International Longshoremen's Ass'n (A.F.L.), Civil No. 47–157, S.D.N.Y., Aug. 21, 1948 (no opinion); United States v. International Union, United Mine Workers, D.C.D.C.1948, 77 F.Supp. 563, appeal dismissed and affirmed in part 85 U.S. App.D.C. 149, 177 F.2d 29, certiorari denied 1949, 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535; United States v. International Union, United Mine Workers,

■ We think it desirable to examine this question *de novo*. It is clear that Sections 176–180 of the Act, 29 U.S.C.A., embody and attempt a legislative solution of problems rising from labor disputes which lead to strikes or lockouts and which, because of their serious impact on national health or safety, may give rise to national emergencies. There was a clear-cut recognition by Congress that labor strife affects adversely important economic and social interests of the public. This appears from the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., itself enacted long prior to the Labor-Management Relations Act with which we are immediately concerned. The latter Act appears to have two major objectives and it is not necessary to decide here which has primary or secondary status. Congress intended the Labor-Management Relations Act to operate by its terms when a strike "affects an entire industry or a substantial part thereof * * *" and "will imperil the national health or safety * * *." 29 U.S.C.A. § 178.

The purposes of the Act are set out in Section 141(b) as follows: "Industrial strife which interferes with the normal flow of commerce and with the full production of articles and commodities for commerce, can be avoided or substantially minimized if employers, employees, and labor organizations * * * recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest.", and "It is the purpose and policy of this * * * [Act], in order to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for pre- venting the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce."

■ The Congressional intent shown here is, first, to protect the rights of both employers and employees and, second, to bring to an end industrial strife which affects commerce to such a degree as to menace the general welfare. See 29 U.S. C.A. §§ 178 and 179. Whether or not the injunction appealed from has or can have the effect of settling the instant labor dispute depends on the proof offered and goes to the issue of the sound exercise of legal discretion on the part of the court below. This phase of the case is discussed at a later point in this opinion.

■ It may be helpful to restate in a few concrete sentences our conception of the congressional intent as expressed in the Act. The underlying concept is one of tort, tortious conduct which affects the national health or safety. See Section 141(b), quoted supra. That tortious conduct consists of permitting a labor dispute to continue to the point where national health or safety is imperiled. In point of time the action or non-action of employers and employees becomes wrongful when national health or safety is imperiled. The President then states his opinion that such is the case and constitutes a Board of Inquiry which proceeds as required by law but without recommendations, the making of recommendations being expressly prohibited by Section 176, 29 U.S.C.A. The United

D.C.D.C.1950, 89 F.Supp. 187; United States v. International Union, Mine, Mill and Smelter Workers, Civil No. 3675, D.Colo., Sept. 5, 1951 (no opinion); United States v. International Longshoremen's Ass'n, D.C.S.D.N.Y.1953, 116 F. Supp. 255, 262; United States v. Union Carbide and Carbon Corp., Civil No. 2456,

E.D.Tenn., Aug. 27, 1954 (unreported); United States v. International Longshoremen's Ass'n, D.C.S.D.N.Y.1956, 147 F. Supp. 425; United States v. Goodyear Atomic Corp., Civil No. 3994, S.D.Ohio, May 15, 1957 (no opinion); United States v. International Longshoremen's Ass'n, D.C., 177 F.Supp. 621.

States then brings a suit such as that at bar and it becomes the duty of the District Court to find or not to find that the circumstances are such, as prescribed in Section 178, that the national health or safety is imperiled. It would, of course, be impossible ordinarily to fix the exact point in time at which the provisions of the Labor-Management Relations Act become operative. The peril must exist at the time the jurisdiction of the United States District Court is invoked and it is the duty of the court in the exercise of its sound legal discretion under the Act to issue an injunction if it finds the necessary operative facts.[3]

In respect to the constitutionality of the Act, the Court of Appeals for the Second Circuit in United States v. United Steelworkers of America, supra, at page 139 of 202 F.2d, said: "The statute creates the right on the part of the public to be protected from the danger of such a strike or lockout. Whether there is an existing or threatened strike or lockout which, under the statute, is an invasion of the rights of the public presents the usual kind of case or controversy which is justiciable by a court."

In United States v. International Longshoremen's Ass'n, D.C.S.D.N.Y. 1953, 116 F.Supp. 262, 265, Judge Weinfeld said: "In exercising jurisdiction under the National Emergencies provisions of the law, the Court acts in the public interest and not in the adjudication of private rights of the contending parties." It is difficult to quarrel with the congressional objectives.

The legislative history supports our view as to the purposes of the Labor-Management Relations Act. It is true, as the Union points out, that the legislation now embodied in Section 178 as it was originally proposed in the House of Representatives had broader scope. Under it the President would have had the power to seek an injunction whenever "a labor dispute has resulted in, or imminently threatened to result in, the cessation or substantial curtailment of interstate or foreign commerce in transportation, public utility, or communication services essential to the public health, safety, or interest,"[4] but in the Senate version, which became what is now Section 178, Senator Taft limited the applicability of the emergency provisions of the statute to situations in which the national "health or safety" was or might become imperiled. But the legislation as enacted nonetheless seems to us to amply embrace the present circumstances.

We are here concerned with the giving of relief by a court of equity in a situation which is alleged to have impaired and seriously menaces the public interest. Cf. Railroad Commission of Texas v. Pullman Co., 1941, 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971, and Virginian Ry. Co. v. System Federation, 1937, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789. The circumstances of the case at bar are somewhat analogous, albeit in different terms, to those in In re Debs, 1895, 158 U.S. 564, 583–590, 15 S.Ct. 900, 39 L.Ed. 1092. In the cited case the United States was held to have *locus standi*, in effect as *parens patriae*, to maintain a proceeding in the nature of a suit to abate a public nuisance. This is a classic field for the interposition of the powers of a court of equity.

Without placing blame upon any of the defendants here, the Union or the Steel Companies, it is alleged, and the government insists that it has proved, that their failure to reach an agreement by the processes of collective bargaining has caused them, and it is feared their country with them, to fall into a slough from which it is necessary to lift them, if only for an 80-day period, lest national health and safety be imperiled. The use

---

3. We point out again that Section 178(a) (ii) provides that the court "shall have jurisdiction to enjoin any such strike * * *."

4. See H.R. 3020, Section 203(a), 80th Cong., 1st Sess. See also "Legislative History of the Labor-Management Relations Act, 1957" (2 Vols.) published by National Labor Relations Board.

of the injunction in a labor dispute, so frequently abused in years past, led to the passage of the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101–115, which prohibited the injunction in a bona fide labor dispute. But the Labor-Management Relations Act specifically has limited the exemption against injunctions in labor disputes granted by the Norris-LaGuardia Act. See Section 178(b), 29 U.S.C.A. However undesirable we may deem the use of the injunction in labor disputes to be, nonetheless Congress has seen fit to reinstate it to the limited degree indicated. The old law of the injunction in the labor dispute, to the extent prescribed, seems to have been returned by Congress to at least part of its former standing and we are compelled to adhere to the posture which Congress has placed upon it.

Historically injunctions in labor disputes dealt with the status of groups, sometimes large groups, of employees. Such decrees may perhaps be described, not entirely inaptly, as "status" judgments. Groups of employees were ordered to return to work or face contempt proceedings. Rarely was an employer subject to a decree preventing lockouts, but this is beside the point. When a court enters a status judgment such as that at bar, in our opinion it acts judicially and not legislatively. If this were not so a substantial portion of the jurisdiction granted to courts of the United States by Congress would fall within the interdiction of Article III, Section 2, of the Constitution. Orders of the National Labor Relations Board frequently would come into such a category, as would orders of the Securities and Exchange Commission, as well as orders of the Interstate Commerce Commission reviewable by the United States district courts under the Urgent Deficiencies Act. Petitions for review of decisions of the United States Tax Court would also fall within the interdiction. Proceedings to require the issuance of a patent by the Commissioner of Patents under R.S. 4915, 35 U.S.C.A. §§ 145, 146, would also meet the ban, Morgan v. Daniels, 1894,

153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657, as would proceedings for naturalization. Tutun v. United States, 1926, 270 U.S. 568, 46 S.Ct. 425, 70 L.Ed. 738. Cf. McGrath v. Kristensen, 1950, 340 U.S. 162, 167–168, 71 S.Ct. 224, 95 L.Ed. 173. The line dividing the powers of the legislative tribunal as distinguished from those of the judicial tribunal is of necessity a fine one.

■ We conclude that the court below was called upon to make and did make a judicial rather than a legislative type of judgment. Our conclusion in this regard is confirmed, we think, by contrasting the statute as enacted with the House proposal which was rejected. The House would have called upon a district court to act whenever in its judgment the public interest was imperiled. This would have left the court at large in deciding the expediency of action guided only by statesmanlike conception of the public welfare. But, as enacted, the statute requires decision whether the evidence adduced in a case shows serious interference with essential national defense activities or threatened impairment of public health. See note 4, supra. This is specific enough and factual enough to bring the inquiry within the area of judicial decision as distinguished from legislative judgment, as in our policy the two are distinguished.

We are of the opinion, for the reasons stated, that the proceeding at bar does constitute a justiciable controversy and does not incur the interdiction asserted by the Union to arise under Article III, Section 2, of the Constitution.

Findings of Fact by the Court Below.

All the necessary jurisdictional facts were found by the court below in its findings of fact, Nos. 1 to 16, inclusive. Findings Nos. 9, 10, 11, 12, 13, 15 and 16, however, are set out in this opinion for the benefit of the reviewing Court. They are as follows:

"9. The strike on the part of the Union resulted from unresolved labor disputes between defendant employers, who are engaged in one or

more of the various stages of steel production, including the mining and transport of iron ore by railroad or vessel, the operation of blast furnaces for the conversion of iron ore into pig iron, the production of steel ingots, the rolling and shaping of steel ingots into various shapes and forms of steel products, and the fabricating of certain finished products, and certain of their employees represented by the Union.

"10. The Board of Inquiry made an investigation of the issues and attempted to have the defendants resolve the dispute by free and collective bargaining. These efforts on the part of the Board of Inquiry were unsuccessful and the disputes remain unresolved.

"11. The report of the Board of Inquiry concludes that 'the parties have failed to reach an agreement and we see no prospects for an early cessation of the strike. The board cannot point to any single issue of any consequence whatsoever upon which the parties are in agreement.' Unless the Court grants the injunction sought by the United States the strike will continue for an indeterminate period.

"12. The strike affects a substantial part of the steel industry of the United States, which is engaged in trade, commerce and transportation among the several States and with foreign nations and in the production of goods for commerce.

"13. The strike, which commenced on July 15, 1959 and has continued until the present time, has resulted in the closing on July 15, 1959 of facilities producing at least 85% of the total steel production of the United States. Inventories of steel have dropped from 24,800,000 tons on July 15, 1959 to approximately 10,000,000 tons. This is below the normal inventory level and is below the level required to sustain continued production of industries and businesses dependent upon steel products. Approximately 500,000 striking members of the Union are now unemployed and more than 265,000 employees are idle in other industries by reason of the steel strike. The 765,000 unemployed support families numbering over 2,000,000 persons. If the strike were to continue, the total number of workers made idle by it would probably reach approximately 1,775,000 by the end of November and approximately 3,000,000 by the end of December. By that time more than 9,000,000 people would probably be affected by the strike.

"15. The strike, which has now been in existence for more than 95 days, if permitted to continue, will imperil the national health and safety in the following respects:

"(a) Certain items of steel required in top priority military missile programs of the United States are not made by any mill now operating, nor available from any inventory or from imports. Any further delay in resumption of steel production would result in an irretrievable loss of time in the supply of weapons systems essential to the national defense plans of the United States and its allies.

"(b) The planned program of space activities under the direction of the National Aeronautics and Space Administration has been delayed by the strike and will be further delayed if it is continued. Specifically, project Mercury, the nation's manned satellite program, which has the highest national priority, has been delayed by reason of delay in construction of buildings essential to its operation. This program is important to the security of the nation. Other planned space programs will be delayed or threatened with delay by a continuation of the strike.

"(c) Nuclear Submarines and the naval shipbuilding program other than submarines, including new con-

struction, modernization, and conversion, have been affected by reason of the inability to secure boilers, compressors, and other component parts requiring steel. Products of the steel industry are indispensable to the manufacture of such items and delay in their production will irreparably injure national defense and imperil the national safety.

"(d) Exported steel products are vital to the support of United States bases overseas and for the use of NATO allies and similar collective security groups. The steel strike, if permitted to continue, will seriously impair these programs, thus imperiling the national safety.

"(e) A continuation of the strike will have the ultimate effect of adversely affecting millions of small business enterprises, almost all of which are directly or indirectly dependent upon steel products and most of which lack the resources to stock large inventories. In addition, it will have the effect of idling millions of workers and a large proportion of the facilities in industries dependent upon steel for their continued operation. Manufacturing industries directly dependent on steel mill products account for the employment of approximately 6,000,-000 workers and normal annual wages and salaries totalling approximately $34,000,000,000. The products of these industries are valued at over $125,000,000,000. The national health will be imperiled if the strike is permitted to continue.

"16. Such results, if the strike is permitted to continue, will imperil the national health and safety and thereby cause irreparable damage and injury to the United States of America for which there is no adequate remedy at law."

### Proof.

This case was submitted to the court below on affidavits and without oral testimony. This method was agreed to by both sides. The result of this method of proof is that the rule which calls upon us to support the findings of the district judge unless clearly erroneous is inapplicable so far as it has to do with the trial court's opportunity to observe the demeanor of the witnesses and like matters. Fed.R.Civ.Proc. § 52(a), 28 U.S.C.A. Moreover, it necessarily deprives the instant record of any elaboration of the evidence of the various affiants which could have been brought out had they appeared in person as witnesses and had been subjected to examination and cross-examination in the usual fashion.

The Union contends that the contents of these affidavits are insufficient to bring the case within the reach of the Labor-Management Relations Act. It points out that the scope of Section 178, 29 U.S.C.A., is limited to situations which will imperil "the national health or safety". The Union says that the country, despite the strike, is prosperous, and that a comparatively small part of the steel output is needed for national defense work and that the steel required for "health" in order to meet the needs of hospital construction and the like is very limited indeed. Moreover, asserts the Union, if the United States needs more steel for any particular defense use or uses the Union, so far as it has power to do so, will cooperate patriotically in seeing that the necessary supply of steel is forthcoming. Furthermore, the Union shows that there is still a good-sized inventory of steel on hand, that steel is available from foreign sources, and that any contention that the industrial dispute with which we are concerned is imperiling the safety and health of the nation is unrealistic because there is no immediate threat of harm.

That portion of the Union's argument that centers attention on today's calm rather than on tomorrow's approaching storm is not well taken. The words of Section 178(a)(ii) speak to the future: viz., "If [the strike is] permitted * * * to continue, [it] will imperil the national health or safety", as has been repeatedly pointed out, is the pertinent phrase.

How far into the future may the United States and the courts look? The Act contains no definition. But there is testimony in the record that the current supplies of steel are very rapidly diminishing. Nor does the proffer of the Union's assistance to get a plant or plants open help much here. The steel industry is too vast and too complicated to be segmented so as to make such a desirable result practicable.

The affidavit of Dr. Raymond J. Saulnier, Chairman of the Council of Economic Advisers, comments cogently on the Union's suggestion that there be a selective reopening of a small number of mills to meet national defense needs. Dr. Saulnier states:

"Steel is not chemically or physically uniform; its products comprise a vast variety of items, made and further processed in specialized facilities of many different mills and plants. * * * Steel is produced through closely interrelated processes that often cannot be separated technically or economically to allow production of items 'needed' * * omitting items 'not needed.' On this point the Business and Defense Services Administration of the Department of Commerce declares that 'in order to satisfy defense requirements alone from the standpoint of size, grade, and product, it would be necessary to reactivate 25 to 30 hot rolling mills together with supporting blast furnaces, and Bessemer, electric, open hearth and vacuum-melting furnaces. Additional facilities for pickling, coating, heat treating, cold finishing, shearing, cutting, testing, and the like would also be required. To reopen these plants for the production of steel products to meet only defense requirements would be totally impracticable. The problems of scheduling the limited tonnages involved, plus the cost and technical difficulty of start-ups and shut-downs would appear to be insurmountable.

\* \* \* \* \* \*

"Obtaining adequate supplies of * * * essential civilian items of steel, like obtaining steel for defense purposes, would clearly require the reopening of more than just a few mills. It would also require the reopening of many related facilities for supplying the component materials of steel-making and for processing, finishing, and distributing steel products.

"Even if it were technically possible to resume steel production on this selective basis, to do so would be exceedingly uneconomic and wasteful. Presumably the Federal Government would be required to underwrite some part of the costs of such a wasteful operation of facilities. For government to undertake such a grotesque, inefficient and costly organization of our steel-producing facilities by reason of a national strike would be offensive to the public conscience, as well as to the public interest."

Other affiants are cabinet officers or the heads of government departments. It is true that some of the statements in the affidavits represent conclusions on facts rather than statements of present facts and of necessity they contain some element of prognosis. These witnesses were entitled to look to the future for the Act itself so looks. Moreover, as was necessarily admitted at the argument before this court, these cabinet officers and department heads speak as experts in their fields of governmental operations. As experts the affiants were entitled to state conclusions as well as facts for the benefit of the court below. The court below was entitled to weigh their testimony in a different light from that of a witness who testifies that a motor car was or was not on a portion of the highway where it did not lawfully belong.

The affidavits referred to contain strong statements indicating that the effect of a prolongation of the present strike would definitely imperil the national health and safety and that disaster

must ensue if the strike continues. Secretary of Commerce Mueller stated:

"Steel plays a role in our economy and in our lives that is crucial in the most literal sense of the word. Indeed, the use of steel in our economy is so pervasive and important that our whole system of production and distribution and our national security, health, and safety are being seriously impaired by the prolonged interruption in its availability.

\* \* \* \* \* \*

"In response to Department of Defense requests for aid in the procurement of items not currently being produced, the Department of Commerce has been unable to carry out its responsibility to be of assistance. It is clear that a continuation of the steel strike will lead to extended delays in military construction and production, including the missile and satellite programs.

\* \* \* \* \* \*

"The steel strike if permitted to continue will seriously impair our security and defense program, thereby imperiling the national safety.

\* \* \* \* \* \*

" \* \* \* it is my opinion that the aforesaid strike, if permitted to continue, will do irreparable damage to our foreign trade, to our domestic trade and to our defense posture. It will therefore seriously imperil the national health and safety."

Acting Secretary of Defense Gates was no less positive in what he had to say:

"I can state unequivocally of my knowledge that steel is one of the most essential elements in the national defense program of the United States and that beyond a certain point of delay in normal deliveries there occurs an irreparable injury to the national defense and consequently to the national safety.

"In my opinion and in the opinion of those persons in the armed services who have the greatest knowledge of these matters, such a point has now been reached and any further delay in resumption of steel production would result in an unretrievable loss of time in the supply of weapons systems essential to the national defense plans of the United States and its allies.

\* \* \* \* \* \*

"Three basic ballistic missile weapon systems are the Atlas, Titan, and Polaris. Of these the first two require land based launching sites involving both above and below ground facilities using large quantities of special steels. The Polaris weapon system includes not only the missile itself but, as well, a special design of nuclear submarine for launching. In the unique design of these weapons are the facilities which are required to make them operational. A significant portion of the steel specified in the procurement contracts is of a composition not common to commercial usage nor available from existing civilian inventories by exercise of allocation or eminent domain powers of the Government.

"In addition to the necessity for special alloys and steel compositions, these programs in many cases require special sizes and shapes, many of which can be fabricated only by firms having a long experience in their production and the necessary special facilities therefor. In summary the shortage of steel for the missile program is not a problem solvable by the mere exchange of other types and forms of steel available in inventories still existing for other purposes or in commercial stocks.

\* \* \* \* \* \*

"In my opinion and in the opinion of those charged with responsibility for the completion of these programs, the delays which have now occurred are only a foretaste of the increasingly greater delays to come if immediate resumption of work in

the steel plants does not occur. The lag time to reach production, the further time required to transport the steel to the fabricator, and the delay occurring thereafter before delivery of the finished component creates a situation where the future scheduling of defense supplies is subject not only to existing but to future indeterminate delay.

\* \* \* \* \* \*

"Each day the strike continues will, in my opinion, add further examples of serious consequences to the shortages now existing and will adversely affect the national defense and imperil the national safety."

Secretary of Labor Mitchell stated that:

" \* \* \* it is my opinion that this strike will, if permitted to continue, seriously imperil the National health and safety."

Deputy Administrator Dryden of the National Aeronautics and Space Administration, commented on the effect of the strike on the nation's space program.

"As the result of information which I have thus received, it is my opinion that the current strike affecting the steel industry has had an adverse effect on accomplishment of the presently planned program of space activities. This opinion is based upon the specific examples described \* \* \*."

General Manager Luedecke, of the Atomic Energy Commission, referred to the effect of the strike on that agency's program.

"Continuity of operation of the Atomic Energy Commission's programs is essential to the national defense. The Commission or its contractors have had on hand or procured sufficient supplies so as not to have been materially affected by the steel strike in construction or repair projects, up till now. However, the strike has already produced delays, so far of a minor nature, in nine military or civilian projects located in California, New Mexico, Nevada, Ohio, New York, and Idaho; and should the strike continue unabated, it would induce a spreading slowdown in construction projects resulting in irretrievable delay \* \* \*. If the strike continues into early 1960, there would be an appreciable effect upon the weapons program."

We have examined carefully the contents of the affidavits submitted by the Union. Variances as they exist between these affidavits and those of the United States are created largely by different avenues of approach. We find no variances in the affidavits basically material to the findings made by the court below or to the issues with which we are immediately concerned.

■ On a review of the entire record we conclude that we cannot say that the findings made by the court below are clearly erroneous.

### The Injunctive Remedy.

The Union argues that even if it be assumed that the findings of the court below are not clearly erroneous an injunction is far too sweeping a remedy for the ills which the court found will result from the continuance of the strike. It points out that the provisions of Section 178(a)(ii), 29 U.S.C.A., merely gave to the court below "jurisdiction to enjoin". The United States contends that on the findings of the court below which we have approved the injunction must issue and that the case presented is so strong that a court of equity would be in error if it refused to give the relief prayed for. In short, the Union contends that the court below in granting the injunction abused its legal discretion and the United States asserts that if the court below had not granted the injunction the refusal would have been a breach of discretion.

■ A portion of the Union's argument in this regard is that there are other statutes which could have been employed by the United States adequately to relieve any danger to the national health or safety and which would have called for

a much less drastic remedy than the injunction appealed from. This is a consideration which a court of equity of necessity must weigh.

The Union points out that Section 101 (a) of the Defense Production Act of 1950 as amended, 50 U.S.C.A.Appendix § 2071(a), authorizes the President:

"* * * (1) to require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preferance to other contracts or orders by any person he finds to be capable of their performance, and (2) to allocate materials and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense."

Additionally, Section 708, 50 U.S.C.A. Appendix, § 2158, of the same Act authorizes the President:

"* * * to consult with representatives of industry, business, financing, agriculture, labor, and other interests, with a view to encouraging the making by such persons with the approval by the President of voluntary agreements and programs to further the objectives of this Act."

The stated policy of the Act is "to provide for the national defense and national security". See 50 U.S.C.A.Appendix, § 2062.

Finally, the Union refers to Section 18 of the Universal Military Training and Service Act, 50 U.S.C.A.Appendix, § 468, which provides:

"Whenever the President after consultation with and receiving advice from the National Security Resources Board determines that it is in the interest of the national securi-

ty for the Government to obtain prompt delivery of any articles or materials the procurement of which has been authorized by the Congress exclusively for the use of the armed forces of the United States, or for the use of the Atomic Energy Commission, he is authorized, through the head of any Government agency, to place with any person operating a plant, mine, or other facility capable of producing such articles or materials an order for such quantity of such articles or materials as the President deems appropriate. Any person with whom an order is placed pursuant to the provisions of this section shall be advised that such order is placed pursuant to the provisions of this section. * * *

"(c) In case any person with whom an order is placed pursuant to the provisions of subsection (a) [of this section] refuses or fails—

* * * * * *

"(2) to fill such order within the period of time prescribed by the President or as soon thereafter as possible as determined by the President;

* * * * * *

"the President is authorized to take immediate possession of any plant, mine, or other facility of such person and to operate it, through any Government agency, for the production of such articles or materials as may be required by the Government."

■■■ We cannot accept the Union's argument in this respect. If our conclusion is correct that there is sufficient evidence in the record of the present or future danger to national health or safety, we conclude that the danger is great enough and calls for a remedy as sweeping as the law will permit. Whether the remedy provided by the Labor-Management Relations Act is sufficient to accomplish a cessation of labor strife is a question not for this court but for Congress. We conclude, therefore, that the

court below did not abuse its discretion in granting the relief which the United States prayed for.

But there is another consideration here which is of vital consequence on the issue of the sound exercise of legal discretion by the court below. Section 179, 29 U.S.C.A., provides the machinery to be employed during the 80-day injunction period for the adjustment by the parties of their differences. This most important portion of the statute provides that it shall be "the duty of the parties to the labor dispute * * * to make every effort to adjust and settle their differences" with the assistance of the Service created by the Act. It further provides that upon the issuance of the injunction the President shall reconvene the Board of Inquiry which previously reported in respect to the labor dispute and at the end of a 60-day period, unless the dispute meanwhile has been settled, the Board of Inquiry shall report to the President the current position of the parties and the efforts which have been made to settle the dispute including a statement "of the employer's last offer of settlement". The President is required by law to make that report available to the public. Last, but by no means least important, Section 179 provides that the "National Labor Relations Board, within the succeeding fifteen days, shall take a secret ballot of the employees of each employer involved in the dispute on the question of whether they wish to accept the final offer of settlement made by their employer", and that the National Labor Relations Board shall certify the results to the Attorney General of the United States within five days thereafter.

If the injunction does not issue the machinery designed by Congress to effect an end to the labor strife, which as we have indicated is one of the prime purposes for which the statute was enacted, cannot be employed, and the menace to national health or safety, the other prime statutory purpose, perhaps cannot be abated. Congress has designed this machinery and has settled the policy embraced in the Labor-Management Relations Act. While the court below in the exercise of its sound legal discretion might have found that the exercise of the provisions of Sections 178 and 179, 29 U.S.C.A., would be ineffectual, rather than efficient, to quell labor strife and obviate the menace to national health or safety, in the light of all the circumstances we cannot say that in issuing the injunction the trial court abused its sound legal discretion. In this respect no judge or tribunal can foretell the future.

The judgment of the court below will be affirmed. Our stay order will be continued for a period of six days to allow aggrieved parties, should they desire to do so, to petition the Supreme Court for *certiorari*. Any further stay must come from the Supreme Court.

HASTIE, Circuit Judge (dissenting).

Without challenging the conclusions of the majority as to the constitutionality of the statute and the sufficiency of proof that the continuing national steel strike imminently threatens serious interference with essential national defense production, I still am not persuaded that a case has been established for the issuance of a Taft-Hartley injunction.

These are the steps in my reasoning. The injunction sought here is an equitable remedy and, therefore, is to be granted or withheld in the exercise of a sound discretion. Accordingly it should not be granted if it apparently would not accomplish its objective. In the emergency strike provisions of the Taft-Hartley law, the primary purpose of a temporary injunction is not to force strikers to return to work but to facilitate a settlement of a serious industry wide strike by collective bargaining. The evidence here shows that an injunction would not facilitate and might even make more difficult a negotiated settlement of the steel strike. In these circumstances an exercise of sound discretion must lead to a denial of the requested injunction. This reasoning is elaborated in what follows.

The national emergency strike provisions of the Taft-Hartley Act, 29 U.S.C.A. §§ 176–180, do not purport to determine the merits of a labor dispute or to terminate a strike by judicial order. The statute merely authorizes a court temporarily to suspend a strike of a certain nationally very harmful type [1] for a period of not more than eighty days while the parties negotiate and the strikers ultimately vote whether to accept whatever final offer management may make. This duty to negotiate and vote is explicit and constitutes the whole machinery of settlement set up by the statute. Thus the apparent purpose of the statute is to create for a limited time a more favorable environment for collective bargaining between the parties to a nationally hurtful strike with the hope and expectation that bargaining and related procedures, outlined in Section 179 of Title 29, will accomplish a settlement of the strike.

It is true that a Taft-Hartley injunction may also have the immediately helpful effect of temporarily restoring much needed production. But if this had been the objective primarily in view there would have been no reason for limiting the term of the injunction to an eighty day period of attempted settlement. Reflecting his primary concern with achieving a negotiated settlement Senator Taft, the principal sponsor of the legislation, explained its philosophy to the Senate in these words:

> "We did not feel that we should put into the law, as a part of the collective-bargaining machinery, an ultimate resort to compulsory arbitration, or to seizure, or to any other action. We feel that it would interfere with the whole process of collective bargaining." 93 Cong.Rec. 3951.

It is also to be considered in judging the primary purpose of the legislation that Congress had already conferred sweeping and more direct authority upon the Executive for satisfying emergency national needs for materials and commodities by seizing struck plants under Section 18 of the Universal Military Training and Service Act [2] and by allocating scarce supplies under Section 101 of the Defense Production Act of 1950 as amended.[3] It is reasonable to believe that some different purpose motivated the Congress in authorizing temporary injunctions under the Taft-Hartley law.

To accomplish its purpose the statute invokes the equity jurisdiction of the district courts. This is done by the provision that if the continuation of a strike of a substantial part of an industry will impair national health or safety, the district court "shall have jurisdiction to enjoin any such strike [for a period which cannot exceed eighty days] * * * and to make such other orders as may be appropriate". The case might have been different had the statute provided for an administrative hearing and determination and an administrative order suspending a strike, with the judicial role limited to enforcement of any permissible order. But Congress having chosen to refer the whole problem to a court of equity exercising its normal historic jurisdiction, the court must consider in the normal fashion of equity whether injunctive relief will serve its intended purpose. Equity refrains from issuing orders which appear vain in that they seem unlikely to serve their intended purpose.

To put the matter somewhat differently, there is no legislative mandate that a court shall grant an injunction whenever a strike is imperiling national health or safety, though such peril is essential to jurisdiction. Rather, a court

---

1. Presumably it is only when a strike imminently and seriously threatens very important national interests that an exception is made to the general policy of non-interference by federal courts in labor disputes.

2. This provision as it appears in 50 U.S.C.A.Appendix, § 468 is quoted in the majority opinion at page 689 of 271 F.2d.

3. This provision as it appears in 50 U.S.C.A.Appendix, § 2071 is quoted in the majority opinion at page 689 of 271 F.2d.

sitting in equity is called upon to balance all equitable considerations inherent in the statutory scheme or disclosed by the evidence in a given case. Under this analysis a primary and essential equitable consideration must be whether the underlying public purpose of the statute to promote and facilitate more effective bargaining would be served. Indeed, in my judgment some utility in accomplishing this primary purpose of the legislation should provide the principal equitable justification of injunctive relief.

Thus, a court, before issuing an injunction under Section 178 of Title 29, should satisfy itself that there is a reasonable basis for belief that a forced suspension of the strike will aid and accelerate the process of collective bargaining. In terms of the present case, has it been made to appear here that the parties are more likely to settle their dispute within the next eighty days if the strike is suspended for that period by court order than they are to accomplish this result while the strike continues?

Examining the pleadings and proof in the present record it appears that neither the government which seeks the injunction nor the steel companies whose employees are striking has shed any light on this critical question. Certainly there is no indication that violence or any other exacerbating conduct in the course of the strike is creating a climate harmful to negotiation. There is no suggestion that any tension, or hostility inimical to negotiation would be relieved or any impediment to settlement removed by a suspension of the strike. There is simply nothing before us which warrants a conclusion that the objective of more productive bargaining would be served by an injunction.

On the other hand there is evidence to the contrary. The question is necessarily one of judgment informed by experience with the course of this strike and the history of other similar situations. The parties have elected to try this case on affidavits. The affidavit of David J. McDonald, President of the defendant union is relevant here. He has deposed as follows:

"On the basis of the information available to me, I firmly believe that if the injunction which is anticipated by these companies should not be issued, a major stumbling block to the negotiation of a voluntary settlement of this dispute will be removed, and a settlement of the dispute will be achieved through the process of free collective bargaining. It is, of course, impossible to predict with certainty the time which will be required to reach such a settlement or what the terms of the settlement will be. I am certain, however, that the anticipation that the strike will be ended or interrupted by an injunction, has operated to remove the economic pressures which would otherwise be felt by both sides to reach a settlement, and that those pressures will operate to assure a settlement within a short period of time if the anticipation of an injunction is removed.

"My firm belief that the anticipation of an injunction has, in fact, prevented a settlement from occurring to date is supported by the views expressed by such impartial experts as George W. Taylor, the Chairman of the Board of Inquiry appointed by the President in this dispute, and former Chairman of the National War Labor Board and the Wage Stabilization Board, Nathan P. Feinsinger and W. Willard Wirtz, both former members of the National War Labor Board and both former Chairmen of the Wage Stabilization Board, in interviews published in the October 19, 1959, issue of U. S. News & World Report, and reproduced, in part, in Appendix B to this affidavit."

The above mentioned statement of George W. Taylor, Chairman of the Presidential Board of Inquiry for this strike and former Chairman of the National War Labor Board, upon this subject was published in question and answer form:

"Q. How do you feel about the Taft-Hartley machinery for handling big strikes? A. [Taylor] Everybody knows it's not adequate to handle those strikes. If the Taft-Hartley procedures are meaningful, they should serve the same function as a strike—that is, get people to modify their extreme positions. I don't think they have done that."

Also in the record is the statement of Nathan P. Feinsinger who has served on the National War Labor Board and the Wage Stabilization Board, and who was chairman of Presidential fact finding boards convened to inquire into the steel and meat packing strikes of 1946 and 1948. Speaking of the effect of Taft-Hartley injunctions, Mr. Feinsinger said:

"A study of the records shows that, in some cases, the injunction has merely stiffened the resistance of the unions. There is a traditional resistance of labor to the injunction as a strike breaking device. I know of no case where an injunction, as such, cleared the atmosphere or expedited the settlement of a dispute."

It also merits mention, although the court below did not have this information, that the very day this case was argued to us both the President, who has invoked Taft-Hartley procedures in this case, and his Secretary of Labor issued public statements deprecating this procedure by injunction and expressing the view that it is not an effective aid in settling an industry wide strike. For the text of the President's statement, at his news conference of October 22nd, see New York Times, October 23, 1959, page 12.

In brief, the sources of information available to us indicate that there is real basis for apprehension that the granting of an injunction will remove existing and rapidly mounting economic pressure upon all parties to settle their differences quickly, and thus be hurtful to the statutory objective of promoting a strike settlement by bargaining. And this is not counterbalanced by any indication that an injunction will in any way advance the bargaining process. Yet, it is the burden of the government which seeks an injunction from a court of equity to show that this relief seems likely to serve its intended purpose.

In my view the only way to avoid the foregoing analysis and its result is to say that the statutory scheme makes it the duty of the court to grant an injunction to halt an industry wide strike on the petition of the government whenever it appears that the national safety or health is being jeopardized. That is a possible scheme. Perhaps it is a desirable scheme. But as I read the Taft-Hartley Act it is not the scheme of the statute. I think Congress undertook a limited intervention of government to aid collective bargaining, and, therefore, that a court should not act absent some showing that it will be aiding a negotiated settlement. That is a sufficient reason for denying injunctive relief here.

Finally, under the authority granted in Section 178 of Title 29, to issue "such other orders as may be appropriate", and guided in part by the manifest will of Congress that the court promote a negotiated settlement, I think it is within the equitable power of the district court, while refusing to enjoin the strike, to require the parties to follow such procedures as under the terms of the statute would be mandatory after an injunction. In this respect I disagree with the view of the majority that such procedures as the statute requires after an injunction are legally impossible without one. If they are reasonable ways of facilitating the settlement of the strike to which the court is addressing itself, I think the court in its discretion may require the parties to follow them without more. Indeed, we have already done as much by ordering that the parties proceed with collective bargaining while staying the order directing that they resume production. Particularly, I would have the district court order the parties to engage in continuing and persistent bargaining, to accept the assistance of the Federal Mc-

diation and Conciliation Service and the Presidential Board of Inquiry and, if settlement should not result within sixty days, to permit the National Labor Relations Board to take a secret ballot of the employees of each employer involved on the acceptance or rejection of their employer's final offer of settlement. This much and no more is in my view an appropriate exercise of equitable judgment and discretion in the circumstances of this case.

On the Matter of Dismissal.

PER CURIAM.

It appearing from a stipulation filed herein on October 27, 1959, that the Kaiser Steel Corporation has concluded an agreement settling its labor dispute with United Steelworkers of America and it appearing therefore that any labor controversy between them has become moot, an order is entered concurrent with this opinion dismissing the instant proceedings as to Kaiser Steel Corporation.

On the Matter of Rehearing
en Banc.

PER CURIAM.

In accordance with the practice of this court the opinions in this case were circulated among the members of the court who did not comprise the panel in this case to determine whether they desired rehearing, Judge Kalodner excepted since he disqualified himself. Rehearing is ordered when a majority of the court so votes.

In view of the emergent circumstances of the case the members of the court who did not sit now express their views in respect to rehearing as follows. Judge McLaughlin and Judge Staley, because of the views expressed in Judge HASTIE's opinion, vote for rehearing *en banc*. Judge Forman votes against rehearing *en banc* because of the views expressed in the majority opinion. Since the court is equally divided there will be no rehearing.