**UNITED STATES of America**

**v.**

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION** (Independent), The New York Shipping Association, Portland Shipping Association, Providence, Rhode Island Shipping Association, New Bedford Stevedoring Corporation, The Steamship Trade Association of Baltimore, Inc., The Boston Shipping Association, Inc., The Philadelphia Marine Trade Association, The Hampton Roads Maritime Association, Inc., South Atlantic Steamship Company, Miami Steamship Association, Mobile Steamship Association, New Orleans Steamship Association, and J. Ross Dunn, Galveston, Texas, Defendants.

United States District Court
S. D. New York.
Dec. 4, 1956.

George Cochran Doub, Asst. Atty. Gen., Paul W. Williams, U. S. Atty., New York City, Donald B. MacGuineas, Atty., Dept. of Justice, Stewart Rothman, Sol. of Labor, Dept. of Labor, Washington, D. C., for plaintiff.

Lorenz, Finn & Giardino, New York City (Alfred Giardino, C. P. Lambos, New York City, of counsel), for New York Shipping Ass'n.

Waldman & Waldman, New York City (Louis Waldman, Seymour Waldman, New York City, of counsel), for ILA (Independent).

FREDERICK van PELT BRYAN, District Judge.

This is a proceeding brought by the Attorney General of the United States pursuant to the National Emergencies provisions of the Labor Management Relations Act of 1947, The Taft-Hartley Act, 61 Stat. 155, §§ 206–210, 29 U.S. C.A. §§ 176–180.

These provisions authorize the Attorney General, upon direction of the President after receipt of the report of a Board of Inquiry appointed by him, to seek an injunction against the continuance of a strike which imperils the national safety and health. An injunction granted under these provisions may extend for a maximum of 80 days during which time there is a mandate upon the Union and the employers involved in the strike to make every effort to settle their differences and machinery is provided whereby such settlement can be made final and complete.

The strike which precipitated this proceeding was that of the longshoremen and related crafts in the maritime industry at Atlantic and Gulf ports from Portland, Maine, to Brownsville, Texas. The strike commenced on October 16, 1956 upon the failure to agree upon new collective bargaining agreements to replace agreements which had expired on September 30, 1956 and which had been extended to November 15, 1956 pending negotiations. The defendants are the Union representing the striking employees, and Employer Associations and employers in the various Atlantic and Gulf ports.

On November 24, 1956 this Court issued a ten-day temporary restraining order which directed that the strike cease and the employees return to work pending the hearing and determination of the motion for an injunction. This order was granted on application of the Attorney General on a showing that all re-

quirements of the statute had been met and that a continuation of the strike would imperil the national health and safety and result in irreparable injury. The hearing on the motion for an injunction was set for November 30.

Upon the return day the attorneys for defendant Union, and defendant New York Shipping Association, appeared. The other defendants defaulted. A stipulation signed by the parties who had appeared was filed with the Court to the effect that if the Cabinet officers and other Government officials upon whose affidavits the temporary restraining order was based, were to give oral testimony in open Court at the hearing, they would testify substantially in accord with their respective affidavits. As had occurred upon the application for the temporary restraining order, defendant New York Shipping Association consented to the granting of the injunction and the Union did not oppose.

The Government then submitted proposed findings of fact and conclusions of law to the Court to which no exceptions were taken by the defendants. It appearing that all the requirements of Sections 206–210 of the Labor Management Relations Act of 1947 had been fulfilled, and that unquestionably the strike, if permitted to continue, would imperil the national safety and health and would cause irreparable injury, the Court announced that it would issue an injunction after making appropriate findings.

The findings of the Court which are filed simultaneously herewith set forth fully the facts and the conclusions of law on which the Court issues the injunction and there is no need to elaborate on them.

The Government also submitted a proposed injunctive order which, in its restraining provisions, followed the terms of the temporary restraining order. Requests were made for a modification of various provisions of this proposed order which required consideration.

Defendant Union made two such requests. First, it requested that members of the Union whose employers were

not members of defendant Employer Associations, and who were not in the six crafts which had gone on strike, should be specifically excluded from the terms of the order and that the order should permit such employees to strike where the strike was local in character and did not extend beyond a single port.

The Union stated that disputes might arise, confined to individual ports, involving members of the Union not in the crafts now on strike and who were not employed by any members of defendant Employer Associations. It claimed that strikes arising out of such disputes would not affect the national health and safety and should not be prohibited by the injunction. However, it does not appear that there is any such situation at present. The inclusion of such a blanket provision as the Union requests at this time would only engender confusion and uncertainty rather than otherwise and would not further the purpose of protecting the national health and safety which the order is designed to accomplish.

In any event, such a modification is not necessary to protect the rights of the Union. If, during the period of the injunction, specific situations along the lines the Union anticipates should arise which require modification of the order, the Union may make application to the Court for appropriate modification based on specific facts involving specific situations.

The second request of the Union was that the order provide that the pay of the employees during the period of the injunction should be the same as that provided in the extension agreements between the Union and the Employer Associations which expired on November 15, 1956, the day the strike was called. Plainly, equity requires that if employees are to be restrained from striking during this cooling-off period the employers must equally be restrained from reducing their pay. If the employees were restrained from enforcing their collective rights by strike while the employers were under no restraint against reducing their wages a complete anomaly would result. I do not suggest that the employers have any such intention, and, in fact, their avowed intention is to the contrary. Nevertheless, the inequity of such a possibility is manifest.

A provision for the maintenance of the wage scales which existed prior to the strike should be provided for in the injunctive order and to this all parties agree. The only question is as to what constitutes the prevailing wage scale immediately prior to the strike.

The two-year agreements which ran from October 1, 1954 to September 30, 1956, fixed wages and working conditions for that period. Upon the expiration of these agreements by their terms on September 30, 1956, and in the light of the negotiations then pending between the employers and the Union, they were twice extended, the last expiry date being November 15, 1956. In addition to incorporating all of the terms and conditions of the two-year agreements, however, the extension agreements also provided:

"Any adjustments in the Wage Scales presently in effect under the respective agreements and/or in the present rate of employer contributions to the Welfare Plan established under said agreements that may be agreed to, as a result of negotiations to be undertaken hereafter for the renewal of said agreements, shall be made retroactive to October 1, 1956 for the period of this extension agreement."

The Union contends that any provisions of the order of injunction which set wage scales should provide for these retroactive benefits. The employers contend that the retroactive benefits should not be included.

■ It appears that at the time of the strike, in addition to the prevailing rates of pay provided in the two-year agreement which expired on September 30, the employees were also entitled to the retroactive benefits of any adjust-

ments in wage scales that might be reached by reason of negotiations. This was as much a part of the compensation agreed to be paid to the employees as the basic wage scale itself. They are therefore entitled to the retroactive adjustments provided for at the time they ceased work, during the period they are working under compulsion of the order of this Court.

The very purpose of this proceeding is to bring about an agreement between the conflicting interests involved in the strike so that peaceful labor relations may be resumed. The parties are directed to continue negotiations for this purpose. The rate at which retroactive wages would be paid is dependent upon these negotiations and is in the control of the negotiating parties. It will be fixed in the negotiations which the Court hopes will be speedily and successfully concluded.

An appropriate provision has therefore been included in the order of injunction directing that the pay of the employees during the period of the injunction shall be the same as that provided by the extension agreements which expired on November 15, 1956, including the clause of those agreements making any adjustments in wage scale as the result of negotiations retroactive to October 1, 1956.

▮ Defendant New York Shipping Association also asked for modification of the order. It claimed that there were instances where employees who had returned to work pursuant to the temporary restraining order were deliberately delaying the performance of their tasks so that the work output was curtailed far below that which should normally have been expected. It therefore requested the Court to include specific language in the order prohibiting slow-downs.

In support of this request it submitted affidavits to the Court which in substance showed that on certain loading and unloading operations some slow-down had occurred. It could not be said from these affidavits, however, that such slow-downs were part of any concerted pattern of action. They appeared to be sporadic. In at least one instance the condition complained of was corrected after officers of the Union had been informed.

No evidence has been presented to this Court that the Union is not in good faith seeking to carry out the provisions of the restraining order. Nor is there any evidence that such slow-downs as may have occurred were the result of any concerted action by the Union or any of its officers, or, indeed, of any given group or groups of employees, to evade the provisions of the restraining order. It may well be that the instances which the shippers cite are merely sporadic manifestations of unrest which might be expected to follow a return to work after a period of strike. On the other hand they may be symptomatic of something more serious.

I stated on the hearing that any concerted attempts at slow-down, if established, would violate the provisions of the restraining order which prohibited the defendants and their officers, agents, servants and employees, and all persons in active concert or participation with them, "from in any manner interfering with or affecting the orderly continuance of work in said industry". This language appears adequate to cover the situation. There is no reason at this time to change the language used in the temporary restraining order which has now been in effect for almost ten days, and which by now should be fully understood by all concerned. In fact, to do so at this stage might tend to promote confusion rather than otherwise. The modification of the order requested by the shippers is therefore denied.

The application of the Government for a temporary injunction is granted. Findings of fact and conclusions of law, and the order of injunction, modified as above indicated, have been signed.