**UNITED STATES of America,**
**Plaintiff,**

**v.**

**INTERNATIONAL LONGSHOREMEN'S**
**ASSOCIATION, AFL–CIO, et al.,**
**Defendants.**

United States District Court
S. D. New York.

Oct. 10, 1964.

Nicholas deB. Katzenbach, Acting Atty. Gen., John W. Douglas, Asst. Atty. Gen., Harland F. Leathers, Attorney, Department of Justice, Washington, D. C., Robert M. Morgenthau, U. S. Atty., New York City, Arthur S. Olick, Asst. U. S. Atty., of counsel, for the United States.

Waldman & Waldman, New York City, Louis Waldman and Martin Markson, New York City, of counsel, for defendant International Longshoremen's Ass'n, etc.

Lorenz, Finn & Giardino, New York City, Alfred Giardino and Constantine B. Lambos, New York City, of counsel, for New York Shipping Ass'n, etc.

COOPER, District Judge.

Plaintiff brings this action under the Labor-Management Relations Act, 1947, as amended (29 U.S.C. §§ 176, 178), to enjoin a strike by the defendant unions which commenced October 1, 1964. On that day, a temporary restraining order, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, was issued out of this Court. The restraining order expires at 8:00 p. m., E.D.T., on October 10, 1964. We now deal with plaintiff's motion for a preliminary injunction heard in open Court on October 8, 1964.

The defendant unions had contracts with the employer-defendants. The contracts expired September 30, 1964. On October 1, 1964 the defendant unions went on strike. Plaintiff claims the result of this action, if continued, will paralyze shipping activity along the Atlantic and Gulf Coasts from Searsport, Maine, to Brownsville, Texas.

On September 30, 1964, the President of the United States found that the

threatened strike if permitted to occur, will affect the maritime industry substantially and imperil the national health and safety. On that same day, the President created a Board of Inquiry (as provided by the Act hereinabove referred to) and directed its members to inquire into the issues involved in the labor disputes which led to the strike. On October 1, 1964, the Board members reported thereon to the President who thereupon directed the Acting Attorney General to institute this action.

## THE FACTS

By proper stipulation, the parties agreed to have this Court consider as sworn testimony, on this application for a preliminary injunction, the affidavits comprising the moving papers of plaintiff and the affidavit offered in opposition to the application.

As we see it, what follows is the essential fact matter here presented.

### The Report to the President by the Board of Inquiry

The report dated October 1, 1964 to the President of the United States by the Board of Inquiry created by executive order dated September 30, 1964, pursuant to authority under Section 206 of the Labor Management Relations Act, 1947 (61 Stat. 155; 29 U.S.C. § 176), revealed these salient observations on the labor dispute involving ILA and the maritime industry engaged on the Atlantic and Gulf Coasts:

(a) At the time of its appointment, no strike actually was in progress, but ILA threatened to strike at the end of their collective bargaining agreement on September 30, 1964.. "The threatened strike has now materialized and shipping on the Atlantic and Gulf Coasts is at a standstill."

(b) This dispute encompasses the entire Atlantic and Gulf Coasts and involves all ports in this area from Searsport, Maine to Brownsville, Texas.

(c) With respect to the same ports and as between the same parties, there exists a history in the last decade of failing to reach agreement in negotiations; injunctive relief had to be resorted to.

(d) The areas of disagreement were not narrowed despite the substantial effort by concededly neutral bodies. The principal issues were manpower utilization, income guarantees, pensions, union participation in hiring practices.

(e) The Board concluded, "The rigidity of positions on many of the main issues, plus the complexity of items concerned with related crafts, makes the possibility of an early settlement most remote."

### Testimony of Deputy Secretary of Defense Cyrus R. Vance

It is his testimony that under the emergency presently existing and in order to participate in the defense of the Free World, the United States maintains American armed forces and provides support to the armed forces of other nations, overseas. Supplies therefor must be ship-transported. "Any interference with the movement of essential cargo and personnel by ocean transportation would seriously jeopardize the discharge of the responsbilities of the Department of Defense and imperil the national security."

While the union has voluntarily agreed, and honored its agreement, to meet major problems in handling military cargo, its commitment does not enable the Department of Defense to carry out all its essential functions involving movements at those ports.

It is also his sworn testimony that the Department of Defense must rely so heavily on the availability of cargo-carrying vessels, that delays in deliveries of military cargo urgently required would prove hazardous in the extreme.

The Secretary agrees with the Acting Secretary of Commerce that the strike's impact "could seriously impair the nation's over-all defense position."

### Testimony of Maritime Administrator Nicholas Johnson

The Administrator calls our attention to certain vital statistics involved here:

The population in the areas serviced by the Atlantic and Gulf Coasts ports, which service all but the Rocky Mountain and Pacific Coast areas, constitutes about 84% (1962) of the total United States population; that employment is extremely high in selected industries—food, chemicals, primary metals, machinery (including electrical) transportation equipment—located in such areas and serviced by these ports; that of the total United States exports and imports (roughly 110 million and 80 million tons respectively of dry cargo each year), 80% moves through the ports here involved.

Of particular significance is his testimony that as a result of the strike virtually all longeshoremen in the areas affected failed to report for work on October 1, 1964, with the result that 197 ships were tied up on that day and 262 on October second.

Since movement through West Coast ports would prove impractical under the tie-up resulting therefrom, the strike "would bring about complete dislocation of the Maritime industry * * * adversely affect the national economy, with attendant peril to the national health and safety."

### Testimony of Acting Maritime Administrator James W. Gulick

The proof from this witness reveals that the principal function of that department is the development of a United States merchant marine (under the Merchant Marine Act, 1936, 46 U.S.C. § 1101 et seq.) powerful enough to carry domestic, export and import water-borne commerce, and capable of serving as a naval and military auxiliary in time of war or national emergency.

He gives it as his opinion under oath that the strike "will * * * very substantially affect the ocean-going foreign and domestic trade of the United States, even to the extent of completely closing down such trade in all Atlantic and Gulf Coast ports, thus materially weakening the national health and safety."

He estimates that involved in the present dispute are approximately 90,000 longshoremen, cargo repairmen, clerks and related workers, and the strike would make idle many thousands of other workers, including seamen and teamsters whose employment depends in one way or another on water transport of cargo.

His sworn summarization of the consequences following strikes by longshoremen along the same ports in the last few years is formidable, indeed. For example, on the fifth day of the strike in October '62, a total of 226 ships were immobilized and within five days of that strike more than 2650 American seamen alone were out of work as a consequence —" * * * the rapid paralysis which can seize shipping and related activities."

He points out that in 1963 approximately 158 million long tons of merchandise, representing approximately 84% of the total tons exported and imported in the ocean-going foreign trade of the United States in that year, and about 54,000 arrivals and departures of vessels in that same year, were handled at such important ports (from Maine to Texas) as New York, Baltimore, Boston, Philadelphia, Hampton Roads and Mobile.

While observing that the stability of the national economy depends largely on the availability of transportation, he makes the important point that the strike will cause industrial breakdown and injury to public health and safety in areas dependent upon fuel and basic materials transported by ocean-going vessels.

The Administrator's sworn testimony includes this about the City of New York: It depends on water transportation for a large portion of its food supply and other essentials. "Any prolonged interruption in the delivery of the food and other supplies would be hazardous to the health and safety of the people living" there. Through its harbor in '63 passed about 10% of this nation's total ocean-going dry cargo foreign commerce.

He further avers that Puerto Rico depends upon exports from continental United States for their food supplies; that " * * * even a short strike with depletion of food stocks would have a critical effect upon the health of the people * * * " there.

The Administrator gives unqualified sworn testimony that a strike would make a serious impact upon the Defense and Aid Programs of our Government. This involves nations receiving economic and military assistance from the United States. Aid and Defense cargoes transported on board United States-flag and foreign-flag commercial vessels "would be halted with resultant detriment to this Government's international economic and military programs."

Of special significance is the Administrator's sworn testimony, "In view of the current international situation, the national safety may be imperiled if a substantial segment of our Merchant Marine is rendered inoperative by the suspension of cargo handling and immobilization of vessels."

He concludes that the strike "would affect a very substantial part of our maritime industry and would imperil our national health and safety."

### Testimony of Secretary of Agriculture of the United States Orville L. Freeman

The strike would severely interrupt vital legal functions he is obligated to pursue. He points out that approximately 1,237,824 long tons of agricultural commodities have been approved by his department "for lifting" during this month of October from the ports involved to foreign countries (normally approximately 2½ million tons would be shipped there during November and December).

Further, the Secretary placed upon the record his testimony that the donation of food items to non-profit voluntary agencies "for use in the assistance of needy persons outside the United States" would be severely curtailed. These donations are an important part of the Food for Peace Program of this country, and movement of such cargoes abroad "will be prevented if the strike continues."

Also, the exchange of agricultural commodities for strategic and critical materials produced abroad, including 10,000 long tons of ferromanganese and 850 short tons of asbestos, are scheduled to arrive at these ports during the next few weeks.

### Testimony of Acting Secretary of Commerce Clarence D. Martin, Jr.

In general terms he alleges that the strike would "paralyze shipping activity * * * and imperil the national health and safety * * * irreparable injury to the national defense * * * seriously impair the nation's overall defense position * * * a marked debilitating effect on * * * United States merchant fleet with respect to its readiness and availability as an instrument of national security in the event of a sudden emergency requirement."

The Acting Secretary concludes that a strike would "seriously imperil the national health and safety."

### Testimony of Administrator of the Agency for International Development David E. Bell

Under the Foreign Assistance Act of 1961, as amended, provision was made for military, economic and technical assistance "designed to promote the foreign policy of the United States and maintain the national defense and security of the United States." The Administrator sees these objectives thwarted by delays in the delivery of commodities.

He testified further that commodities designated as emergency assistance to free peoples in order to avoid famine will be strike-bound. Such donees of essential Food-For-Peace shipments include The World Food Program and "Vietnamese who suffer the hardship of war."

The Administrator presses the point that 78 countries receive financial assistance from the United States by way of cargoes financed under AID programs. "Included * * * is Vietnam. The

prompt delivery of commodities to Vietnam is essential to the United States program of support for that country. * * * "

The Administrator concludes that the strike "will adversely affect foreign assistance programs of the United States which are essential to the foreign policy and to the national defense and security of the United States * * * and the national health and safety of the United States will be imperiled to the extent of such damage."

### Testimony of Secretary of Labor W. Willard Wirtz

As he sees the situation, the strike would "imperil the national health and safety."

### Testimony of Chairman, Interstate Commerce Commission Abe McGregor Goff

The Chairman believes the strike will require embargoes in these ports by the railroads and surface transportation facilities. Included in the cargoes of ships presently at these ports and en route are such commodities as ore, chemicals and other raw materials assigned to manufacturers of products essential for national defense.

As to the strike, Chairman Goff concludes his testimony, it " * * * will so disrupt domestic transportation, storage, and port operations that the national health and safety will be imperiled."

### Affidavit of Chairman New York Shipping Association, Inc. Alexander P. Chopin

Much of his affidavit deals with the enormous activity in the Port of New York and the crippling effects of a strike. He points out too that the brief work stoppage at the commencement of this month necessitated the employment, at overtime premium rates, of twice the number of longshoremen on Saturday and Sunday, October 3rd and 4th, in order to handle cargo that had backed up as a result of the strike.

### Testimony of President, International Longshoremen's Association, AFL–CIO Thomas W. Gleason

Mr. Gleason properly addresses himself to many segments of the various issues making up the totality of this proceeding. Confining ourselves at this point, however, to facts bearing on whether this strike, if permitted to continue, will imperil national health and safety, Mr. Gleason maintains that the Government's proof fails "to demonstrate that there is *now*—that is, immediately upon commencement of the ILA strike—a national emergency whereby the 'national health or safety' is imperiled." Further, that on the first day of this month "there was not only a lack of any incipient national emergency, there was very little work for longshoremen to do. The reason for this is that the shipping companies in anticipation of a possible strike had cleared the great bulk of vessels out of the harbor beforehand. * * * "

As to "our national needs for defense and governmental functions," Mr. Gleason's sworn testimony is to the effect that "the ILA had issued firm instructions in connection with the strike that, notwithstanding the strike, the ILA members shall handle such cargo."

### THE LAW

As we see it, emphasized particularly are the legal points that follow.

### The Objection to the Board of Inquiry

The defendant unions object to the nature and celerity of government action in the proceeding before the President's Board of Inquiry. They claim denial of an opportunity to confront their adversary in the presentation of evidence; inadequate time to prepare presentation of the facts; that the Board improperly delegated its functions to one of its three members, and so deprived the unions of a "hearing" before the full Board; that a "hearing" was denied them in violation of their rights under §§ 206–207 of the Act.

■ From where do these claimed rights spring? Certainly not from the Act itself. Section 207(a) of the Act

clearly indicates that the granting of a "hearing" is within the sound discretion of the Board. The defendant unions are not legally provided with a right to a "hearing" before the Board.

A board of inquiry shall be composed of a chairman and such other members as the President shall determine, and shall have power to sit in any place within the United States *and to conduct such hearings either in public or in private, as it may deem necessary or proper, to ascertain the facts with respect to the causes and circumstances of the dispute.* (Emphasis added.)

In addition, § 206 of the Act expressly provides that the Board "shall not [make] any recommendations", but rather shall limit its report to a statement of the facts and positions of the parties with respect to the dispute.

■■ The Board is an investigative body without adjudicative powers. The procedure to be followed by the Board in ascertaining the facts and positions of the parties is left by the Act to the Board. When a body is created for the sole purpose of finding facts which may subsequently be used as the basis of executive action, there is no requirement to provide a judicial or a quasi-judicial type hearing. Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1959); Cf. Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1950).

The Board's granting of a hearing is discretionary as is the procedure to be followed in gathering of facts and positions of the parties. We are convinced the Act confers no right to a hearing, much less a right to advocacy or "trial-like proceedings."

### Granting of an Injunction

The only purpose for which an injunction may be entered under § 208(a) (ii) of the Act is to enjoin a strike or lockout, or the continuing thereof which, if permitted to occur or continue, would imperil the national health or safety. The function of such an injunction is to preserve the *status quo* as it existed prior to the actual or threatened strike or lockout.

■ In considering whether to grant or deny the injunction, this Court may not enter into certain general inquiries which, in other circumstances, might be entirely appropriate. For example, the court may not inquire, as defendant unions argued it should, as to whether national labor policy will be served; or whether, as the unions urged, other remedies might be available; or as to the effect of such an injunction upon the collective bargaining in the particular case. "Congress was not concerned with the merits of the parties' positions or the conduct of their negotiations." United Steelworkers of America v. United States, 361 U.S. 39 at 41, 80 S.Ct. 1, at 3, 4 L.Ed.2d 12 (1959).

Of cardinal concern for the Court's consideration as to the issuance of a § 208 injunction is whether a strike or lockout, threatened or actual, affects an industry of the kind the statute describes, and in such a manner that, if permitted to continue, will imperil the national health or safety.

Defendant unions' contention that an injunction may be granted "only when the national health or safety [is] actually imperiled" does not accord either with the express words of the statute or with the case law thereunder. Labor Management Relations Act, § 208. This, of course, does not imply that the Court abandons its duty to determine, as of now, whether on the specific facts before it, a continuance of the strike would imperil national health or safety. United States v. United Steelworkers of America, 271 F.2d 676 at 681–682 (3d Cir. 1959), aff'd. United Steelworkers of America v. United States, supra.

### The Injunction Provisions

Defendant unions refer to certain provisions in the temporary restraining order which they urge should be eliminated from any injunction that might issue.

■ They claim that the insertion of a "good faith bargaining" clause in the

injunction would be beyond the power of this Court. That claim is wholly without merit, for § 208(a) (ii) of the Act gives this Court the authority to grant an injunction and make "such other orders as may be appropriate." The spirit as well as the letter of § 209(a) of the Act clearly calls for such a provision. See United States v. International Longshoremen's Ass'n, D.C., 116 F.Supp. 262 at 266–267 (1953); United States v. International Longshoremen's Ass'n, D.C., 147 F.Supp. 425 (1956).

■ Defendant unions' contention that a provision enjoining "any action which would interfere with this court's jurisdiction in the premises" is too broad in scope, cannot be sustained. United States v. International Longshoremen's Ass'n, D.C., 147 F.Supp. 425 (1956).

■ Defendant unions contend this Court is without power to issue an injunction running against its members, particularly those enrolled in Locals outside of the United States. The members, however, stand in no different relation to the unions than the officers, agents and employees to their employers. Moreover, the jurisdiction of this Court based on the fact that a strike is threatened which would imperil the national health or safety, permits the Court to issue a decree addressed to all involved in the labor disputes.

Elimination of some union members from the coverage of the injunction might well constitute an invitation to crippling wild-cat strikes, or at the very least hinder the process of good faith negotiation.

■ The defendant unions request two provisions be inserted in the injunction. One would make retroactive to October 1, 1964 any adjustments in wages and any increase in contributions to welfare and pension plans. The second seeks continuance "in full force and effect" the provisions of the expired collective bargaining agreement. The Government opposes the first and upon oral argument did not oppose the second. The employer defendants opposed both.

This Court might have been disposed to grant the request regarding retroactivity had such a provision been included in an extension agreement between the unions and employers, as was the situation in United States v. International Longshoremen's Ass'n, D.C., 147 F.Supp. 425 at 428 (1956). Here, however, we have no such agreement. To insert the requested provision would alter rather than maintain the *status quo*, and might hinder, rather than aid, an early resolution of the conflicting interests involved in the labor dispute. Such an issue is best left to the bargaining in good faith of the parties. United States v. International Longshoremen's Ass'n, D.C., 177 F.Supp. 621 at 624 (1959).

■ The second request, on the other hand, does serve to preserve the relationship between the parties. Equity requires that if union members are to be restrained from striking during the 80 day cooling-off period, employers be prevented also from reducing work gangs or taking any of the steps they had sought to persuade the unions to accept in pre-strike negotiations. The prior collective bargaining agreement provides ready reference to the respective rights and duties of the parties. Its continuation during the injunction period does not preclude a provision in any new collective bargaining agreement making parts thereof retroactive; nor does it preclude, in a given situation, an application to modify the injunction on specific facts. Labor Management Relations Act, § 208(a) (ii); International Ass'n of Machinists, AFL–CIO v. Boeing Co., 315 F.2d 359 (9th Cir. 1963); United States v. International Longshoremen's Ass'n, D.C., 147 F.Supp. 425 (1956).

## CONCLUSION

■ On the state of the complete record before us and the law applicable thereto, our course is clear—preliminary injunctive relief is imperative, for this Court is satisfied that a strike would

affect a substantial part of an industry engaged in trade and commerce, transportation, transmission and communications among the several States and with foreign nations as well as between the United States and certain of its territories or possessions; that if the strike is resumed, it will imperil the national health and safety, and thereby cause irreparable injury to this country.

The findings of fact and conclusions of law are filed simultaneously herewith and are to be considered part of this opinion. Upon them, this Court issues the preliminary injunction sought here.

So ordered.